**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
Email: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Kaili C. Lynn (State Bar No. 334933)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: klynn@bursor.com
           jwilner@bursor.com

**BURSOR & FISHER, P.A.**
Max S. Roberts (State Bar No. 363482)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10069
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-mail: mroberts@bursor.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STACY PENNING, SUNGGIL HONG, LAURA BONETTI, JONATHAN FINESTONE, and DILARA USKUP individually and on behalf of all other persons similarly situated,<br><br>                Plaintiffs,<br><br>          v.<br><br>MICROSOFT CORPORATION,<br><br>                Defendant. | Case No.: 3:25-cv-10557-CRB<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

**PAGE**

NATURE OF THE ACTION ..................................................................................................1

THE PARTIES ......................................................................................................................1

I.     PLAINTIFFS ...........................................................................................................1

II.    DEFENDANT ..........................................................................................................2

JURISDICTION AND VENUE ...........................................................................................2

FACTUAL ALLEGATIONS ...............................................................................................3

I.     DATA BROKERS AND REAL-TIME BIDDING: THE INFORMATION ECONOMY ..............................................................................................................3

       A.     Data Brokers ................................................................................................3

       B.     Real-Time Bidding .......................................................................................7

       C.     Cookie Syncing ..........................................................................................13

II.    AN OVERVIEW OF DEFENDANT'S ONLINE TRACKING AND ADVERTISING TECHNOLOGY ..........................................................................16

       A.     The Adnxs Pixel .........................................................................................16

              1.     Interception Of Communications .................................................18

              2.     Collection of Persistent Identifiers ..............................................21

                     a.     IP Addresses ......................................................................24

                     b.     Mobile Advertising Identifiers ..........................................26

                     c.     Other Identifiers.................................................................31

              3.     User ID Mapping with getUID and mapUID ...............................32

       B.     Xandr ...........................................................................................................35

              1.     Microsoft Invest...........................................................................36

              2.     Microsoft Monetize ......................................................................37

              3.     Microsoft Curate...........................................................................42

III.   DEFENDANT'S PIXELS ARE PRESENT ON EACH OF THE SUBJECT WEBSITES AND ACROSS THE INTERNET ....................................................43

       A.     Scientific American .....................................................................................43

B.    AliExpress ...................................................................................................46

C.    Bon Appetit .................................................................................................49

E.    Expedia ........................................................................................................56

F.    Hyatt ............................................................................................................58

G.    Plushcare......................................................................................................59

H.    Zillow ..........................................................................................................62

    1.    The Adnxs Pixel on the Zillow Website........................................62

    2.    The Bing Pixel on the Zillow Website ..........................................64

I.    Redfin ..........................................................................................................65

    1.    The Adnxs Pixel on the Redfin Website .......................................65

    2.    The Bing Pixel on the Redfin Website..........................................66

J.    Healthline ....................................................................................................68

    1.    The Adnxs Pixel on the Healthline Website..................................68

    2.    The Bing Pixel on the Healthline Website ....................................70

IV.    DEFENDANT'S SERVICES DEANONYMIZE USERS AND ENRICH DEFENDANT, WEBSITE OPERATORS, AND PARTNER PIXELS ALIKE THROUGH REAL-TIME BIDDING AND PROFILING INDIVIDUALS........................71

A.    Defendant Combines The Data From All The Subject Websites With Other Data To Deanonymize Users................................................................71

B.    The Partner Pixels Use The Profiles Created By Defendants To Enhance Their Advertising And Analytics Services ..................................72

V.    PLAINTIFFS' EXPERIENCES........................................................................73

A.    Plaintiff Stacy Penning.................................................................................73

B.    Plaintiff SungGil Hong.................................................................................75

C.    Plaintiff Laura Bonetti..................................................................................76

D.    Plaintiff Jonathan Finestone .........................................................................78

E.    Plaintiff Dilara Uskup...................................................................................80

CLASS ALLEGATIONS.............................................................................................81

CAUSES OF ACTION.................................................................................................83

COUNT I.........................................................................................................83

COUNT II................................................................................................................85

COUNT III ..............................................................................................................88

COUNT IV ..............................................................................................................91

COUNT V ................................................................................................................92

PRAYER FOR RELIEF ......................................................................................................95

JURY TRIAL DEMANDED ...............................................................................................95

Plaintiffs Stacy Penning, SungGil Hong, Laura Bonetti, Jonathan Finestone, and Dilara Uskup ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Microsoft Corporation ("Microsoft" or "Defendant"). Plaintiffs bring this action based upon personal knowledge of the facts pertaining to themselves, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1. This class action lawsuit sets forth how the business practices of Microsoft amount to constant, widespread surveillance of millions of Americans via their activity on the Internet and mobile applications. Through its advertising and analytics platform, Xandr, and its Adnxs and Bing Pixels, Microsoft tracks in real time and records indefinitely the personal information and specific web activity of hundreds of millions of Americans.

2. This unlawfully collected information is worth billions of dollars to Defendant because it makes up the content of Microsoft's extensive line of data analysis products and creates individual sales of advertisements in the real-time-bidding ecosystem present on thousands of major websites.

3. Plaintiffs bring this action to enforce their constitutional rights to privacy and to seek damages under California law for the harm caused by the collection and sale of their confidential data and personal information.

## THE PARTIES

I. PLAINTIFFS

4. ***Plaintiff Stacy Penning.*** Plaintiff Stacy Penning is a natural person and citizen of California, residing in El Cerrito, California. Plaintiff Penning was in California when he accessed numerous websites where Defendant's Pixels were present and had his activity on those websites and subsequent activity on other websites tracked by Defendant .

5. ***Plaintiff SungGil Hong***. Plaintiff SungGil Hong is a natural person and citizen of California, residing in San Diego, California. Plaintiff Hong was in California when he accessed numerous websites where Defendant's Pixels were present and had his activity on those websites and subsequent activity on other websites tracked by Defendant .

6.    ***Plaintiff Laura Bonetti***.  Plaintiff Laura Bonetti is a natural person and citizen of California, residing in Venice, California. Plaintiff Bonetti was in California when she accessed numerous websites where Defendant's Pixels were present and had her activity on those websites and subsequent activity on other websites tracked by Defendant .

7.    ***Plaintiff Jonathan Finestone.***  Plaintiff Jonathan Finestone is a natural person and citizen of California, residing in West Hollywood, California. Plaintiff Finestone was in California when he accessed numerous websites where Defendant's Pixels were present and had his activity on those websites and subsequent activity on other websites tracked by Defendant .

8.    ***Plaintiff Dilara Uskup.*** Plaintiff Dilara Uskup is a natural person and citizen of California, residing in Los Angeles, California. Plaintiff Uskup was in California when she accessed numerous websites where Defendant's Pixels were present and had her activity on those websites and subsequent activity on other websites tracked by Defendant.

## II.    DEFENDANT

9.    Defendant Microsoft Corporation is a Washington corporation with its principal place of business in Redmond, Washington.  Microsoft uses its proprietary technology, including but not limited to the Adnxs Pixel, Bing Pixel, and Xandr platform to accomplish the widespread surveillance and  unlawful sharing and sale of data alleged herein.

<div align="center">

**JURISDICTION AND VENUE**

</div>

10.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from at least one Defendant.

11.    This has personal jurisdiction over Defendant because Defendant collected the private information of thousands or millions of people in California, sold that information to advertisers in California—who targeted advertisements to Californians based in part on their location in California—and profited from the sale of Californians' personal information.

12.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this District and Plaintiff Penning resides in this District.

**FACTUAL ALLEGATIONS**

**I.    DATA BROKERS AND REAL-TIME BIDDING: THE INFORMATION ECONOMY**

13.    To put the invasiveness of Defendant's privacy violations into perspective, it is important to understand three concepts: data brokers, real-time bidding, and cookie syncing.

14.    The import of these concepts is that: (i) Defendant acts as a data broker that uniquely identifies and de-anonymizes users of various websites and mobile application by matching users' persistent identifier (*See infra*) values with comprehensive profiles held by Defendant; (ii) those profiles are offered up for sale through the real-time bidding process to the benefit of Defendant, the Partner Pixels, and Defendant's clients and to the detriment of users' privacy interests; and (iii) Defendant continues to build on those profiles by syncing with the Partner Pixels on websites and mobile applications and by sharing information about Class Members via server-to-serve (S2S) communications, and the value of its services enables Defendant to be brought onto a wide swath of websites and mobile applications, thus perpetuating the mass surveillance of users.

**A.    Data Brokers**

15.    While "[t]here is no single, agreed-upon definition of data brokers in United States law,"[1] California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions.  (Civ. Code § 1798.99.80(c).)

16.    An entity that qualifies as a "data broker" under California law must specifically register as such.  Cal. Civ. Code § 1798.99.82(a)

17.    Some data brokers, like Defendant, prefer to characterize themselves as "identity graph providers," but this is a distinction without a difference.  "An identity graph provides a single

---

[1] Justin Sherman, *Data Brokers and Sensitive Data on U.S. Individuals: Threats to American Civil Rights, National Security, and Democracy*, Duke Sanford Cyber Policy Program, at 2 (2021), https://techpolicy.sanford.duke.edu/wp-content/uploads/sites/4/2021/08/Data-Brokers-and-Sensitive-Data-on-US-Individuals-Sherman-2021.pdf.

unified view of customers and prospects based on their interactions with a product or website across a set of devices and identifiers. An identity graph is used for real-time personalization and advertising targeting for millions of users."[2] This is exactly what data brokers do, and indeed, the entities that provide identity graphs are by and large required to register as data brokers under California law. An "identity graph provider" is therefore just a euphemism for "data broker."

18.    "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[3] Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data." And whereas individual data sources "may provide only a few elements about a person's activities, data brokers combine these elements to form a detailed, composite view of the consumer's life."[4]

19.    For instance, as a report by NATO found, data brokers collect two sets of information: "observed and inferred (or modelled)." The former "is data that has been collected and is actual," such as websites visited.[5] Inferred data "is gleaned from observed data by modelling or profiling," meaning what consumers may be *expected* to do.[6] On top of this, "[b]rokers typically collect not only what they immediately need or can use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[7]

---

[2] IDENTITY GRAPHS ON AWS, https://aws.amazon.com/neptune/identity-graphs-on-aws/.

[3] Sherman, *supra*, at 2.

[4] Tehila Minkus et al., *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM ON CONFERENCE ON ONLINE SOCIAL NETWORKS 71, 71 (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.

[5] Henrik Twetman & Gundars Bergmanis-Korats, *Data Brokers and Security*, at 11, NATO Strategic Communications Centre Of Excellence, (2020), https://stratcomcoe.org/cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.

[6] *Id*.

[7] *Id*.

20.     Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[8]  The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[9]

21.     This data collection has grave implications for Americans' right to privacy.  For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[10]

22.     As another example:

> Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights.  Even if data brokers do not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.
>
> This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements.  Many industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.
>
> …
>
> Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further

---

[8] Sherman, *supra*, at 1.

[9] *Id*.

[10] *Id*. at 9.

driving up costs of goods and services (from insurance to housing) for minority groups.[11]

23.     Similarly, as the report from NATO noted, corporate data brokers cause numerous privacy harms, including but not limited to depriving consumers of the right to control who does and does not acquire their personal information, unwanted advertisements that can even go as far as manipulating viewpoints, and spam and phishing attacks.[12]



24.     Of course, data brokers do not just track people for no reason; they do so because they have their trackers installed on users' browsers and are paid by website and mobile app operators (or the Partner Pixel operators) to do so.  In return, data brokers' services become more valuable because data brokers can track users on a wider variety of platforms

25.     Data brokers are able to compile such wide swaths of information in part by collecting

---

[11] *Id.*

[12] Twetman & Bergmanis-Korats, *supra* note 4, at 8.

users' IP addresses and other device information, which is used by data brokers like Defendant to track users across the Internet.[13]

26.    Indeed, as McAfee (a data security company) notes, "data brokers … can even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[14]

27.    These data brokers will then:

> take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you.  They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single."  Then, they sort you into groups of other people like you, so they can sell those lists of like-people and generate their income.[15]

28.    In short, data brokers track consumers across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder. The "highest bidder" is a literal term, as explained below.

### B.    Real-Time Bidding

29.    So, once data brokers collect information from consumers and create comprehensive user profiles, how do they "sell" or otherwise monetize that information?  This is where real-time bidding—and the Microsoft software that is at issue in this action—comes in.

30.    "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[16]

---

[13] *Id*. at 11.

[14] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, McAfee (Jan. 28, 2025), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

[15] Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, Fathom Analytics (May 10, 2022), https://usefathom.com/blog/data-brokers.

[16] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

31.     "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)."  An SSP "work[s] with website or app publishers to help them participate in the RTB process."  "DSPs primarily work with advertisers to help them evaluate the value of user impressions and optimize the bid prices they put forth."[17]  And an Advertising Exchange "allows advertisers and publishers to use the same technological platform, services, and methods, and 'speak the same language' in order to exchange data, set prices, and ultimately serve an ad."[18]

32.     In other words, (i) SSPs work with website operators to provide user information to advertisers that might be interested in those users; (ii) DSPs work with advertisers to help advertisers select which users to target, and ultimately make bid to show advertisements to selected users; and (iii) an Advertising Exchange is the platform on which all of this happens.

33.     As described in more detail below, Microsoft participates on all sides of this process. The Adnxs Pixel—now known as "Microsoft Invest"—is a DSP,[19] and Xandr provides both an SSP and DSP.[20]  This tracks with the trend of many technology companies serving both the "publisher" and "advertiser" (supply and demand, respectively) sides of the RTB ecosystem.[21]

34.     The RTB process works as follows:

> After a user loads a website or app, an SSP will send user data to Advertising Exchanges … The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more.  After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.

[17] Geoghegan, *supra*.

[18] *Introducing To Ad Serving*, MICROSOFT IGNITE (Mar. 3, 2024), https://learn.microsoft.com/en-us/xandr/industry-reference/introduction-to-ad-serving.

[19] MICROSOFT INVEST, https://about.ads.microsoft.com/en/solutions/technology/microsoft-invest-dsp ("Microsoft Invest is a demand-side platform built for the future of video advertising.").

[20] *Introducing To Ad Serving*, *supra*.

[21] *See* Amir Sharer, *Why SSPs and DSPs are Breaking the Barrier Between Supply and Demand*, ADEXCHANGER (May 2, 2024), https://www.adexchanger.com/data-driven-thinking/why-ssps-and-dsps-are-breaking-the-barrier-between-supply-and-demand/.

Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost. But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process. This information can be added to existing dossiers DSPs have on a user.[22]



35.    Facilitating this real-time bidding process means SSPs and DSPs—like those offered by Microsoft—must have as much information as possible about consumers to procure the greatest interest from advertisers and obtain the highest bids for website and app operators' users. But these SSPs and DSPs receive assistance by connecting with other third parties like data brokers and Data Management Platforms ("DMPs") to de-anonymize users and bolster the information they can either provide to advertisers or advertisers can consider when making bids:

the economic incentives of an auction mean that DSP with more specific knowledge of individuals will win desirable viewers due to being able to target them more specifically and out-bid other entities. As a consequence, the bid request is not the end of the road. The DSP enlists a final actor, the data management platform (DMP) [or data broker, like Defendants]. DSPs send bid requests to DMPs, who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers. The DSP also wins the right to cookie sync its own cookies with those from the [Advertising Exchange], thus enabling easier linkage of the data to the user's profile in the future.[23]

---

[22] Geoghegan, *supra*; *see also* REAL-TIME BIDDING, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.

[23] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022) https://tinyurl.com/yjddt5ey; *see also*



36.     In other words, before bidding to show a user an advertisement, SSPs and DSPs like those offered by Defendant will attempt to determine what other information about a user may be available.  SSPs and DSPs do this by connecting with entities like data brokers, DMPs, and the like, who match a consumer's information from a particular website or mobile application (*e.g.*, their IP address, device metadata, other unique identifiers) with any profiles on those users data brokers may have compiled.  If there is a match, then advertisers will pay more money to show users an advertisement because the advertisers have more information to base their targeting on.  This naturally enriches website and app operators, as their users are now more valuable.  It also enriches SSPs who can offer users to advertisers for more money based on the greater number of traits available, and DSPs who can receive higher bids for the same users.  And SSPs and DSPs can continue linking users on a website or mobile application through the Advertising Exchange, which enhances the SSP's and DSP's ability to better identify users in the future and helps the SSP and DSP profit further as well.

37.     Defendant benefits because (i) Defendant will gain information from the SSPs, DSPs, and other ad-tech players it syncs with that it can add to its already comprehensive profiles, and (ii) that will make Defendant's services more valuable.

---

PERION, WHAT IS A SUPPLY-SIDE PLATFORM (SSP): DEFINITION AND IMPORTANCE, https:// perion.com/publishers/what-is-a-supply-side-platform-ssp-definition-and-importance/.

38.   As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

(a)   "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [*i.e.*, website and app operators] to share as much end-user data as possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."

(b)   "send[ing] sensitive data across geographic borders."

(c)   sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad. Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[24]

39.   The last point bears additional emphasis, as it means the data Defendant provides through its DSP services to serve targeted advertisements is even provided to those entities who do not actually serve an advertisement on a consumer. This greatly diminishes the ability of users to control their personal information.

40.   Likewise, the Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[25]

---

[24] FEDERAL TRADE COMMISSION, UNPACKING REAL TIME BIDDING THROUGH FTC'S CASE ON MOBILEWALLA (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.

[25] Geoghegan, *supra*.

41.    For these reasons, some have characterized "real-time bidding" as "[t]he biggest data breach ever recorded" because of the sheer number of entities that receive personal information[26]:



42.    All of this is in line with protecting the right to determine who does and does not get to know one's information, a harm long recognized at common law and one statutes like the CIPA were enacted to protect against. *Ribas v. Clark*, 38 Cal. 3d 355, 361 (1985) (noting the CIPA was drafted with a two-party consent requirement to protect "the right to control the nature and extent of the firsthand dissemination of [one's] statements"); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763-64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person."); *Selby v. Sovrn Holdings, Inc.*, 2025 WL 2950164, at *3 (N.D. Cal. Oct. 17, 2025) (finding a "highly offensive privacy intrusion" and "injury for the purposes of CIPA" where "Plaintiffs have alleged that Sovrn engages in unauthorized widespread tracking and data collection, allowing it to compile detailed profiles of each Plaintiff's online web browsing activity—including highly sensitive browsing activity—tied to their email address and other personal identifiers") (cleaned up); *Deivaprakash v. Condé Nast Digital*, --- F. Supp. 3d ---, 2025 WL 2541952, at *4 (N.D. Cal. Sept. 4, 2025) (finding standing for the purpose of CIPA and "likely [] Article III" where the collection of IP addresses and other identifiers "allowed the third parties to: (1) build a profile reflecting

[26] DR. JOHNNY RYAN, "RTB" ADTECH & GDPR, https://assortedmaterials.com/rtb-evidence/ (video).

[plaintiff's] personal information; and (2) interfere with [plaintiff's] ability to remain anonymous"); *Gilligan v. Experian Data Corp.*, 2026 WL 32259, at *2 (N.D. Cal. Jan. 6, 2026) ("Experian engages in unauthorized widespread tracking and data collection, allowing it to compile detailed profiles of each Plaintiff's online web browsing activity tied to their email address and other personal identifiers, and that Experian continues to track "future web browsing activity across the internet."… such allegations satisfy the requirement for a "highly offensive" intrusion that invades reasonable internet users' expectations of privacy.") (cleaned up).

### C.    Cookie Syncing

43.    It should now be clear both the capabilities of data brokers like who de-anonymize users, and the reasons that Defendant's technology is installed on websites (to provide more information to advertisers in real-time bidding).  The final question is how does Defendant share information with other services to either offer the most complete user profiles up for sale or solicit the highest and most informed bids from advertisers?  This occurs through "cookie syncing."

44.    Cookie syncing is a process that "allow[s] web companies to share (synchronize) cookies, and match the different IDs they assign for the same user while they browse the web."[27] This allows entities like Defendant to circumvent "the restriction that sites can't read each other cookies, in order to better facilitate targeting and real-time bidding."[28]

45.    Cookie syncing works as follows:

> Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rd-parties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future.  Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.
>
> Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com.  Thus, advertiser.com does not (and cannot) know which users visit website3.com.  However,

[27] Panagiotis Papadopoulos et al., *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

[28] Gunes Acar et al., *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014)

*as soon as the code of tracker.com is called, a GET request is issued by the browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator advertiser.com this time, using a specifically crafted URL (step 3).*

…

When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. *To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user.* Effectively, CSync enabled advertiser.com to collaborate with tracker.com, in order to: (i) find out which users visit website3.com, and (ii) *synchronize (i.e., join) two different identities (cookies) of the same user on the web.*[29]



46.    Through this process, third party trackers like Defendant's are not only able to resolve user identities (*e.g.*, learning that who Third Party #1 knew as "userABC" and Third Party #2 knew

[29] Papadopoulos, *supra*, at 1433.

as "user123" are the same person), they can "track a user to a much larger number of websites," even though that "do not have any collaboration with" the third party.[30]

47.     On the flip side, "CSync may re-identify web users even after they delete their cookies."[31]  "[W]hen a user erases her browser state and restarts browsing, trackers usually place and sync a new set of userIDs, and eventually reconstruct a new browsing history."[32]  But if a tracker can "respawn" its cookie or like to another persistent identifier (like an IP address), "then through CSync, all of them can link the user's browsing histories from before and after her state erasure. Consequently: (i) users are not able to abolish their assigned userIDs even after carefully erasing their set cookies, and (ii) trackers are enabled to link user's history across state resets."[33]

48.     Thus, "syncing userIDs of a given user increases the user identifiability while browsing, thus reducing their overall anonymity on the Web."[34]

49.     Cookie syncing is precisely what is happening here.  When Defendant's technology like the Adnxs Pixel is installed on users' browsers, Defendant's technology syncs Defendant's unique user identifiers with other third parties on the websites (*e.g.*, the Partner Pixels listed below). The result of this process is not only that a single user is identified as one person by these multiple third parties, but they share all the information about that user with one another (because the cookie is linked to a specific user profile).  This prevents users from being anonymous when they visit websites.

*        *        *

50.     To summarize the proceeding allegations, data brokers focus on collecting as much information about users as possible to create comprehensive user profiles.  Through "cookie syncing," those profiles are shared with Defendant's advertising technologies and other entities (and vice versa) to form the most fulsome picture (literally, a profile) with the most attributes as possible.

---

[30] Papadopoulos, *supra*, at 1434.

[31] *Id*.

[32] *See id*.

[33] *Id*.

[34] *Id.* at 1441.

And those profiles and sold to and bought by advertisers through real-time bidding using the technology Defendant implements on the websites, where users will command more value the more advertisers know about a user. Thus, Defendant enriches the value that website users would otherwise command by tying the data they obtain directly from users on websites with comprehensive user profiles in their possession or in the possession of other entities they sync with.

51.  Accordingly, Defendant is using its conjunction in conjunction with website operators and other third parties to (i) de-anonymize users, (ii) allow users to be bought by and sold to advertisers in real-time bidding, and (iii) allow website operators to monetize websites by installing Defendant's Pixels and allowing Defendant to collect as much information about users as possible (without consent).

52.  Of course, Defendant also benefits from this arrangement because websites and apps will want to employ Defendant's services to bring in more advertising revenue, meaning Defendant can continue to expand and grow the information they have about any consumers and add to consumers' profiles, which further perpetuates the value of Defendant's services.

53.  As it stands though, Defendant is already one of the largest players in this industry. Defendant achieved this status using a variety of technologies and services, as described below.

## II.  AN OVERVIEW OF DEFENDANT'S ONLINE TRACKING AND ADVERTISING TECHNOLOGY

### A.  The Adnxs Pixel

54.  Microsoft oversees a massive web of online tracking technologies that provide ongoing information to Microsoft and its partners.

55.  The collection of this highly detailed information relies on a series of "pixels" loaded onto websites.

56.  A pixel is a piece of code that website operators can integrate into their websites to "track[] the people and type of action they take."[35]

---

[35] *Retargeting*, Meta, https://www.facebook.com/business/goals/retargeting (last accessed Feb. 12, 2025).

57. Microsoft collects information on Internet users' activity on a wide variety of websites using the Adnxs Pixel, a pixel it owns and develops through partnering with other data brokers and advertisers.

58. The advertisers that Microsoft contracts with also have their own pixels ("Partner Pixels"), which are integrated into the design of websites. To facilitate the identity resolution and real time bidding processes, described below, these pixels interact with and receive information from, the Adnxs Pixel when both pixels are loaded onto a particular website.

59. Plaintiffs' testing revealed that the Adnxs Pixel interacts with dozens of Partner Pixels on websites across the internet.

60. Microsoft collects additional data from Internet users through Microsoft's interactions with users and through Microsoft's products.[36] Microsoft collects data by and through users' interactions, use, and experiences with Microsoft's products.[37] Microsoft also obtains data about Internet users from Microsoft affiliates, subsidiaries, and third parties.[38] Microsoft shares data "with Microsoft-controlled affiliates and subsidiaries [and] with vendors working on [Microsoft's] behalf."[39] This data is combined with the data collected from internet pixels to build even more comprehensive profiles about the behavior and characteristics of millions of people.

61. Microsoft has several methods to collect data on users. For instance, Microsoft applications use additional identifiers, such as the Advertising ID in Windows.[40] "Windows generates a unique advertising ID for each person using a device, which app developers and advertising networks can then use for their own purposes, including providing relevant advertising in apps."[41] According to Microsoft, when the advertising ID is enabled, both Microsoft apps and third-party apps can access and use the advertising ID in much the same way that websites can access

[36] *Microsoft Privacy Statement*, Microsoft, https://www.microsoft.com/en-us/privacy/privacy statement#mainpersonaldatawecollectmodule (last updated Jan. 2025).

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] *Id.*

and use a unique identifier stored in a cookie.[42]  Thus, a user's advertising ID can be used by app developers and advertising networks to provide "more relevant" advertising across their apps and on the Internet.[43]

**B.    The Bing Pixel**

62.    Microsoft owns and develops a second pixel, the Bing Pixel, which is similarly deployed on websites across the internet.

63.    The Bing Pixel does not, itself facilitate real-time bidding.  Instead, the Bing Pixel installs tracking cookies on the browsers of visitors to the websites where it is loaded and intercepts the content of user communications and other interactions with those websites.

64.    The data collected by the Bing Pixel is similarly used by Defendants to add to its consumer data profiles and data advertising products described herein.

**C.    The Microsoft Surveillance Apparatus**

65.    All of the above information is used to identify individuals and track their activity, but wiretapping communications and collection of persistent identifiers play particular roles in the Microsoft surveillance apparatus.

1.    *Interception Of Communications*

66.    When an individual visits a website, they communicate a wide variety of information to that website.  This can be as simple as their selection of an article or video the individual would like to view, but can also include highly personal information such as health status and treatment, travel plans, political affiliation, sexual orientation, and many, many more.

67.    When the Adnxs Pixel or Bing Pixel is loaded on to a website, Defendant surreptitiously intercepts these communications. The primary way this is accomplished is through the collection of the universal resource locator ("URL") for each page of each website visited by an individual.

68.    Sometimes known as a "web address," the URL is the name of the webpage as displayed in the address bar of a browser.

---

[42] *Id*.

[43] *Id*.

69.    Each page on a website has its own individual URL, allowing pixels with access to the URL to see which pages of a website a particular Internet user visited.

70.    All URLs identify the pages of each page of a website an internet user visited, but some—depending on the design of the website also disclose the contents of information entered onto a webpage.  These URLs are known as full-string descriptive URLs.

71.    For example, when a user enters information into the Expedia website indicating where they would like to stay and the dates of travel, that information is included in the URL of the webpage with the search results.



72.    The Adnxs Pixel and Bing Pixel collect the URL values of the pages visited by millions of internet users and, thus, intercept communications between individuals and those websites, including sensitive information like travel information and health information.

73. As such, any pixel that intercepts the URL on this page also intercepts the content of the users' communications with Expedia about their travel plans. This process works similarly on other websites.

74. The Microsoft pixels collect both types of URLs and any information that can be gleaned or inferred from those URLs are added to the profiles that Defendant has for that particular user.

75. Further, with the Microsoft Pixels, Microsoft is able to keep track of users by tracking the referrer URL of the page the pixel was loaded from.[44] In even the most basic implementation of the pixels, Microsoft is able to track page views and identify the URLs driving them.[45] Because Microsoft tracks Internet users' URLs, it also tracks information from those URLs.

76. The Adnxs Pixel and Bing Pixel also intercept communications between individual internet users and websites that are not contained in the page URL.

77. For example, on the Hyatt website, the Adnxs Pixel intercepts booking information from the website itself through a "pageview" event.



---

[44] *Microsoft Invest – Universal Pixel*, Microsoft (Oct. 14, 2024), https://learn.microsoft.com/en-us/xandr/invest/the-universal-pixel.

[45] *Microsoft Monetize – Universal Pixel Basic Implementation*, Microsoft (Feb. 7, 2024), https://learn.microsoft.com/en-us/xandr/monetize/universal-pixel-basic-implementation.

| Code | Method | Host | Path | Start | Duration |
|---|---|---|---|---|---|
| ⊙ | GET | secure.adnxs.com | /getuid?https%3A%2F%2Fpixel.mediaiqdigital.com%2Fpixel%3. | 09:18:25 | 100 ms |

Filter: adnxs

Overview  **Contents**  Summary  Chart  Notes

:authority  secure.adnxs.com
:method  GET
**:path**  /getuid?https://pixel.mediaiqdigital.com/pixel?u8=Los%20Angeles&u9=Hyatt%20House&u19=2025-02-27&u20=2025-

⊙ :path                                                                          ×

/getuid?https://pixel.mediaiqdigital.com/pixel?u8=Los%20Angeles&u9=Hyatt%20House&u19=2025-02-27&u20=2025-03-02
&u5=0194f602f1cd00a58b8fbf7fffa80506f0016067012d8&u6=1&u7=0&pixel_id=848529&uid=$UID

accept-
accept-
cach
priority  i

78.     The Adnxs Pixel and Bing Pixel are both configured to intercept confidential communications between internet users and websites. The intercepted information is then added to Defendant's consumer profiles and shared with bidders and advertisers as part of the real-time bidding process on thousands of websites.

        2.      *Collection of Persistent Identifiers*

79.     Another way Microsoft tracks individuals across multiple websites is through the use of persistent identifiers.  As the name suggests, persistent identifiers are identifying information that follows an Internet user from one website or app to another.  Microsoft uses these identifiers to confirm that a person using a particular website is the same person identified by Microsoft on another website.

80.     One form of persistent identifiers is a browser "cookie."  "Cookies are bits of data that are sent to and from your browser to identify you.  When you open a website, your browser sends a piece of data to the web server hosting that website."[46]

81.     When the Adnxs Pixel or Bing Pixel is called onto a website, it automatically downloads a cookie onto the browser of the person visiting the website.  Microsoft then links a proprietary ID number to the cookie and the individual with the cookie.

---

[46] *Everything You Need To Know About Internet Cookies*, Microsoft (Apr. 25, 2023), https://www.microsoft.com/en-us/edge/learning-center/what-are-cookies?form=MA13I2.

**82.     In other words, Microsoft effectively "stamps" each cookie with its own identifier to better enable it to track individuals across the Internet.**

83.     After the cookie is loaded onto a person's browser, each time that person visits a website where a Microsoft pixel is called, Microsoft uses the cookie to identify the website visitor as the same person who visited previous websites with the same cookie installed on their browser. As such, Microsoft is able to track each individual internet user across multiple sites to create a more detailed profile on that person's beliefs, interests, and habits.

84.     This information is cross-referenced with other information collected by Microsoft to specifically identify the individual using the device and to add this web-activity information to a larger profile on the individual in order to sell their profile for targeted advertising.

85.     Microsoft associates users with several types of unique identifiers.  The first is the "uuid2," which "identifiers a returning user's device" and is "used for targeted ads."[47]

86.     The second is the "XANDR_PANID," which "registers data on the visitor" and "is used to optimize advertisement relevance."[48]

---

[47] TYSABRL, COOKIES, https://www.tysabri.com/en_us/cookies.html.
[48] *Id.*

87. The third is the "UIDS" parameter. The "UIDS" value is encoded in Base64, which can be easily decoded on publicly available websites.[49] Decoding the UIDS values above yields the user IDs for Partner Pixels that Microsoft's pixels are syncing with, which are then permanently stored with the cookie on the users' browsers. This allows Microsoft to identify the user based on other third party identifiers, and this value is constantly updated as Microsoft syncs with further third parties. For instance, the below screenshot shows the "UIDS" cookie includes identifiers for registered data brokers like PubMatic,[50] Magnite (Rubicon),[51] OpenX,[52] and Taboola[53]:

IwMjQtMTAtMDFUMjA6MDI6MTRaIn0sInB1Ym1hdGljIjp7InVpZCI6IkIxMzU2Q0E1LUIzNzYtNDM0MS1CMUMwLUExQTczNUNBNjM4NCIsImV4cGlyZXMiOiIyMDI0LTEwLTAxVDIwOjAyOjEyWiJ9LCJyaXNlIjp7InVpZCI6Ik1kVVp3NnYtQyIsImV4cGlyZXMiOiIyMDI0LTEwLTAxVDIwOjAyOjE4WiJ9LCJydWJpY29uIjp7InVpZCI6Ikx URzBSWIU2LTE4LUpDTzEiLCJleHBpcmVzIjoiMjAyNC0xMS0wNVQyMTozNDozMVoifSwic21hcnRhZHNlcnZlciI6eyJ1aWQiOiIzNjg3ODQ5NzQyMDEwMzkzMzQ1IiwiZXhwaXJlcyI6IjIwMjQtMTAtMDFUMjA6MDI6MDZaIn0sInNtaWxld2FudGVkIjp7InVpZCI6IjgxZDNkZWYxMDFmNTM2MThiMDMzOGFmYjgxZGY3Njg2IiwiZXhwaXJlcyI6IjIwMjQtMTAtMDFUMjA6MDI6MTZaIn0sInNvbm9iaSI6eyJ1aWQiOiIjN2U2MWYzMy0zM2NlLTRhMDQtOGFkMS03ZDIyZTlkMGEyMTEiLCJleHBpcmVzIjoiMjAyNC0xMS0wNFQxMjo1MToyMVoifSwidGFib29sYSI6eyJ1aWQiOiJiNmFiMTYzYy05Y2I5LTQ2ZjEtOGU3Zi1kOWVkYzJlYzRiMjMtdHVjdGNlMjIxODkiLCJleHBpcmVzIjoiMjAyNC0xMC0wMVQyMDowMjowNloifSwidHJpcGxlbGlmdCI6eyJ1aWQiOiIxNzY3NDUzMDM4MzcwNjYzMDU4MzkwIiwiZXhwaXJlcyI6IjIwMjQtMTEtMDRUMTI6NTE6MjJaIn0sInlpZWxkbW8iOnsidWlkIjoiVmh3MTMzM3Z2UTNaVkpiYVhMdjEiLCJleHBpcmVzIjoiMjAyNC0xMC0wMVQyMDowMjowMloifSwieWllbGRvbmUiOnsidWlkIjoiOWEwOGVlMTQtYmFhZS00NDg5LThmNjItYjA2NjJiYzk0MmZhIiwiZXhwaXJlcyI6IjIwMjQtMTAtMDFUMjA6MDI6MTdaIn0sImV4cGlyZXMiOiIyMDI0LTExLTA0VDEyOjUxOjQ2WiJ9LCJ0aGVhZHgiOnsidWlkIjoiN2JmYjhhMzAtMm QwMi00MGQ1LTUzMWEtYzllM2M4ZDEyNDI1IiwiZXhwaXJlcyI6IjIwMjQtMTEtMDRUMTI6NTE6NDhaIn19fQ

49 *See*, *e.g.*, https://www.base64decode.org/.

50 DATA BROKER REGISTRATION FOR PUBMATIC, INC., https://oag.ca.gov/data-broker/registration/186702.

51 DATA BROKER REGISTRATION FOR MAGNITE INC., https://oag.ca.gov/data-broker/registration/568127.

52 DATA BROKER REGISTRATION FOR OPENX TECHNOLOGIES, INC., https://oag.ca.gov/data-broker/registration/193614.

53 DATA BROKER REGISTRATION FOR TABOOLA, INC., https://oag.ca.gov/data-broker/registration/186589.

### a.    IP Addresses

88.    IP addresses are another common persistent identifier.

89.    An IP address is a unique set of numbers assigned to a device on a network, which is typically expressed as four sets of numbers separated by periods (*e.g.*, 192.168.123.132).  The traditional format of IP addresses is called IPv4, and it has a finite amount of combinations and thus is limited to approximately 4.3 billion addresses.  Because this proved to be insufficient as the Internet grew, IPv6 was introduced.  IPv6 offers a vastly larger address space with 340 undecillion possible addresses.  While IPv6 adoption has been increasing, many networks still rely on IPv4.[54]

90.    Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another.  An IP address is essential for identifying a device on the Internet or within a local network, facilitating smooth communication between devices.

91.    IP addresses are not freely accessible.  If an individual is not actively sending data packets out, their IP address remains private and is not broadcast to the wider internet.

92.    IP addresses can be used to determine the approximate physical location of a device.  For example, services like iplocation.io use databases that map IP addresses to geographic areas—often providing information about the country, city, approximate latitude and longitude coordinates, or even the internet service provider associated with the public IP.[55]  Thus, knowing a user's public IP address—and therefore geographical location—"provide[s] a level of specificity previously unfound in marketing."[56]

93.    An IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[57] and (ii) "to target specific households, businesses[,] and even

[54] *See, e.g.*, *What is the Internet Protocol?* CloudFlare, https://www.cloudflare.com/learning/network-layer/internet-protocol/ (last accessed Feb. 12, 2025); *What is an RFC1918 Address?* Netbeez (Jan. 22, 2020), https://netbeez.net/blog/rfc1918/.

[55] *IP Location Lookup*, iplocation.io, https://iplocation.io/ (last accessed Feb. 12, 2025).

[56] *IP Targeting: Understanding This Essential Marketing Tool*, AccuData (Nov. 20, 2023), https://web.archive.org/web/20231209011353/https://www.accudata.com/blog/ip-targeting/.

[57] *Location-based Targeting That Puts You in Control*, choozle, https://choozle.com/geotargeting-strategies/ (last accessed Feb. 12, 2025).

individuals with ads that are relevant to their interests."[58]  Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[59] because "[c]ompanies can use an IP address … to personally identify individuals."[60]

94.     In fact, an IP address is a common identifier used for "geomarketing," which is "the practice of using location data to identify and server marketing messages to a highly-targeted audience.  Essentially, geomarketing allows [websites] to better serve [their] audience by giving [them] an inside look into where they are, where they have been, and what kinds of products or services will appeal to their needs."[61]  For example, for a job fair in a specific city, companies can send advertisements to only those in the general location of the upcoming event.[62]

95.     "IP targeting is a highly effective digital advertising technique that allows you to deliver ads to specific physical addresses based on their internet protocol (IP) address.  IP targeting technology works by matching physical addresses to IP addresses, allowing advertisers to serve ads to specific households or businesses based on their location."[63]

96.     "IP targeting capabilities are highly precise, with an accuracy rate of over 95%.  This means that advertisers can deliver highly targeted ads to specific households or businesses, rather than relying on more general demographics or behavioral data."[64]

97.     In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's IP address because it "can be more cost-effective than other forms

[58] Herbert Williams, *The Benefits of IP Adress Targeting for Local Businesses*, Linkedin (Nov. 29, 2023), https://tinyurl.com/4uk2p7k9.

[59] *IP Targeting: Understanding This Essential Marketing Tool*, *supra*.

[60] Trey Titone, *The Future of IP Address As An Advertising Identifier*, Ad Tech Explained (May 16, 2022) https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

[61] *Geomarketing Strategies & Tips: The Essential Guide*, Deep Sync (Jan. 3, 2025), https://deepsync.com/geomarketing/.

[62] *See*, *e.g.*, *Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI , https://www.geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-marketing-campaigns (last accessed Feb. 12, 2025).

[63] *IP Targeting*, Savant DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV5-5maUaAgtNEALw_wcB (last accessed Feb. 12, 2025).

[64] *Id*.

of advertising."[65]  "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[66]

98.    Further, "IP address targeting can help businesses to improve their overall marketing strategy."[67]  "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[68]

99.    Putting IP addresses in the hands of the data brokers who sync with Microsoft is particularly invasive, as the NATO report noted:

> [a] data broker may receive information about a[] [website] user, including his … IP address.  The user then opens the [website] while his phone is connected to his home Wi-Fi network.  When this happens, the data broker can use the IP address of the home network to identify the user's home, and append this to the unique profile it is compiling about the user.  If the user has a computer connected to the same network, this computer will have the same IP address. The data broker can then use the IP address to connect the computer to the same user, and identify that user when their IP address makes requests on other publisher pages within their ad network. Now the data broker knows that the same individual is using both the phone and the computer, which allows it to track behaviour across devices and target the user and their devices with ads on different networks.[69]

100.    For these reasons, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[70]

### b.    Mobile Advertising Identifiers

101.    Microsoft employs similar methods to track individuals using mobile apps on Android and iOS devices.

---

[65] Williams, *supra* note 39.

[66] *Id*.

[67] *Id*.

[68] *Id*.

[69] Twetman & Bergmanis-Korats, *supra* note 4.

[70] *Is an IP Address Personal Data?* Convesio, https://convesio.com/knowledgebase/article/is-an-ip-address-personal-data/ (last modified June 22, 2024); *see also Data Protection Explained*, European Commission,        https://commission.europa.eu/law/law-topic/data-protection/data-protection-explained_en (last accessed Feb. 12, 2025).

102. Microsoft owns and operates multiple "software development kits" (SDKs), pieces of code that work independently or with "application programming interfaces" (APIs) and are loaded into mobile apps and can track users' activity on certain apps.[71]

103. An SDK is a "set of tools for developers that offers building blocks for the creation of an application instead of developers starting from scratch … For example, Google Analytics provides an SDK that gives insight into user behavior, engagement, and cross-network attribution."[72]

104. An API "acts as an intermediary layer that processes data transfer between systems, letting companies open their application data and functionality to external third-party developers [and] business partners."[73] An API can "work[] as a standalone solution or included within an SDK … [A]n SDK often contains at least one API."[74] APIs "enable[] companies to open up their applications' [or websites'] data and functionality to external third-party developers, business partners, and internal departments within their companies."[75]

105. Similar to the pixels on web browsers, the Microsoft SDKs are called by other SDKs when a user accesses a particular app.

106. The Microsoft SDKs track the types of user information Defendant obtains through the Microsoft pixels including, but not limited to, users': location information, email addresses, device and advertising identifiers, and usage of the particular app being accessed.

107. In addition to its own ID tracking, Microsoft collects advertising identifiers that are designed to track the app activity of individual users across different apps. Two of the most

---

[71] *SDK vs. API: What's the difference?* IBM (July 13, 2021), https://www.ibm.com/blog/sdk-vs-api/ ("SDK" stands for software development kit and "is a set of software-building tools for a specific program," while "API" stands for application programming interface). Plaintiff will refer to both collectively as the "Microsoft SDKs" to avoid any confusion.

[72] *API vs. SDK: The Difference Explained (with Examples)*, stream, https://getstream.io/glossary/api-vs-sdk/ (last accessed Feb. 13, 2025).

[73] Michael Goodwin, *What is an API (application programming interface)?* IBM, Apr. 9, 2024, https://www.ibm.com/topics/api.

[74] IBM, *supra* note 52.

[75] *Application Programming Interface*, sdxcentral, https://www.sdxcentral.com/resources/glossary/application-programmatic-interface-api/ (last accessed Feb. 13, 2025).

---

prominent are AAIDs (for Android devices) and IDFAs (for iOS devices) (collectively, "Mobile Advertising IDs" or "MAIDs").

108.    An AAID is a unique string of numbers that attaches to a device. As the name implies, an AAID is sent to advertisers and other third parties so they can track user activity across multiple mobile applications.[76] So, for example, if a third party collects AAIDs from two separate mobile applications, it can track, cross-correlate, and aggregate a user's activity on both apps.

109.    Although technically resettable, an AAID is a persistent identifier because average users are not aware of AAIDs and, correspondingly, virtually no one resets that identifier. The fact that the use and disclosure of AAIDs is so ubiquitous evidences an understanding on the part of Defendant, and others like Google in the field that AAIDs are almost never manually reset by users (or else an AAID would be of no use to advertisers). Byron Tau, *Means of Control: How the Hidden Alliance of Tech and Governments is Creating a New American Surveillance State*, at 175 (2024) ("Like me, most people had no idea about the 'Limit Ad Tracking' menu on their iPhones or the AAID that Google had given even Android devices. Many still don't."); see also *Louth v. NFL Enterprises LLC* (D.R.I. Sept. 12, 2022) 2022 WL 4130866, at *3 ("While AAID are resettable by users, the plaintiff plausibly alleges that AAID is a persistent identifier because virtually no one knows about AAIDs and, correspondingly, virtually no one resets their AAID.") (cleaned up).

110.    Using publicly available resources, an AAID can track a user's movements, habits, and activity on mobile applications.[77] Put together, the AAID serves as "the passport for aggregating all of the data about a user in one place."[78]

111.    Because an AAID creates a record of user activity, this data can create inferences about an individual, like a person's political or religious affiliations, sexuality, or general reading

---

[76] *Advertising ID*, Google, https://support.google.com/googleplay/android-developer/answer/6048248 (last accessed Feb. 13, 2025).

[77] Thomas Tamblyn, *You Can Effectively Track Anyone, Anywhere Just By the Adverts They Receive*, HuffPost, Oct. 19, 2017, https://www.huffingtonpost.co.uk/entry/using-just-1000-worth-of-mobile-adverts-you-can-effectively-track-anyone_uk_59e87ccbe4b0d0e4fe6d6be5.

[78] *Trend Report: Apps Oversharing Your Advertising ID*, International Digital Accountability Council, https://digitalwatchdog.org/trend-report-apps-oversharing-your-advertising-id/ (last accessed Feb. 13, 2025).

and viewing preferences. These inferences, combined with publicly available tools, make AAIDs an identifier that sufficiently permits an ordinary person to identify a specific individual.

112. Similarly, an "Identifier for Advertisers, or IDFA for short, is a unique, random identifier (device ID) that Apple assigns to every iOS device. An IDFA would be the equivalent of a web cookie, in the sense that it enables advertisers to monitor users' engagement with their ads, and keep track of their post-install activity."[79]

113. As with the Microsoft cookie and AAID, Microsoft's collection of IDFAs allows Microsoft to track iOS users' activity across the various apps they use. Like the AAID, this data can create inferences about an individual, such as a person's political or religious affiliations, sexuality, or general reading and viewing preferences. These inferences, combined with publicly available tools, sufficiently permit even an ordinary person to identify a specific individual with the IDFA.

114. Regardless of whether these IDs are supposed to be anonymous, MAIDs are often combined with other identifiers to identify users in what is known as ID Bridging. "ID Bridging" is the process of "piecing together different bits of information about" a user "to confidently infer that it is the same individual accessing a publisher's site or sites from various devices or browsers."[80] That is, users can be identified and tracked by "bridging" (or linking) their MAIDs to other sources, such as e-mail addresses, geolocation, or phone numbers.

---

[79] *Identifier for Advertisers (IDFA)*, Apps Flyer, https://www.appsflyer.com/glossary/idfa (last accessed Feb. 13, 2025).

[80] Kayleigh Barber, *WTF is the difference between ID bridging and ID spoofing?* Digiday, July 9, 2024, https://digiday.com/media/wtf-is-the-difference-between-id-bridging-and-id-spoofing/.



115. ID Bridging "has long been the foundation of the programmatic advertising,"[81] which is the process by which companies "use [] advertising technology to buy and sell digital ads" by "serv[ing] up relevant ad impressions to audiences through automated steps, in less than a second."[82] It entails a "unique identifier [] assigned to individual devices," including Google's Advertising ID," personal information like geolocation and e-mail address, and "cross-platform linkage."[83]

116. ID Bridging is a money-making machine for advertisers and app developers. On the advertiser side, ID Bridging "increase the chances of an ad buying platform finding their inventory to be addressable and, therefore, maximizes their 'ad yields.'" And on the app developer side, "publishers can boost revenue from direct-sold campaigns by offering advertisers access to more defined and valuable audiences."[84]

117. In other words, advertisers will be able to find users that are more directly and likely interested in what is being sold by having access to significantly more information. And app users'

---

[81] Matt Keiser, *How Can ID Bridging – The Foundation of Our Space – Suddenly Be a Bad Thing?* Ad Exchanger (July 23, 2024), https://www.adexchanger.com/data-driven-thinking/how-can-id-bridging-the-foundation-of-our-space-suddenly-be-a-bad-thing/.

[82] *Programmatic Advertising*, Amazon, https://advertising.amazon.com/blog/programmatic-advertising# (last accessed Feb. 13, 2025).

[83] Anete Jodzevica, *ID Bridging: The Privacy-First Future of Audience Targeting*, Setupad (Nov. 15, 2024) https://setupad.com/blog/id-bridging/.

[84] Bennett Crumbling, *What is 'ID Bridging' and how publishers use it to grow direct and programmatic revenue?* Optable (Aug. 22, 2024), https://www.optable.co/blog/what-is-id-bridging.

---

information will be more valuable (and therefore, bring in more money to app developers) because it is combined with a plethora of other information from various sources.

118.    Many companies (*e.g.*, data brokers, identity graph providers), publicly advertise their ability to conduct such bridging.  Yet, while those within the ID Bridging industry describe it as privacy-protective, it is anything but.  As courts have noted, the "ability to amass vast amounts of personal data for the purpose of identifying individuals and aggregating their many identifiers" creates "dossiers which can be used to further invade [users] privacy by allowing third parties to learn intimate details of [users'] lives, and target them for advertising, political, and other purposes, ultimately harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them."  (*Katz-Lacabe v. Oracle Am., Inc.* (N.D. Cal. 2023) 688 F. Supp. 3d 928, 940 [cleaned up].)

119.    In February 2019, Oracle published a paper entitled, "Google's Shadow Profile: A Dossier of Consumers Online and Real World Life," part of which provides as accurate a description of Google's services (and Oracle's, ironically) as Defendant's:

> a consumer's "shadow profile" [is a] massive, largely hidden dataset[] of online and offline activities.  This information is collected through an extensive web of … services, which is difficult, if not impossible to avoid.  It is largely collected invisibly and without consumer consent.  Processed by algorithms and artificial intelligence, this data reveals an intimate picture of a specific consumer's movements, socio-economics, demographics, "likes", activities and more.  It may or may not be associated with a specific users' name, but the specificity of this information defines the individual in such detail that a name is unnecessary.[85]

120.    In other words, ID Bridging is dangerous because of the sheer expanse of information being compiled by companies like Defendant's without the knowledge or consent of users, all of which is being done for pecuniary gain.

### c.    Other Identifiers

121.    In addition to the methods described above, which are explicitly designed to track individuals across different devices and apps, Microsoft collects other identifying information that

---

[85] *Google's Shadow Profile: A Dossier of Consumers Online and Real World Life*, Oracle, at 1 (Feb. 2019), https://tinyurl.com/2mtuh7vf.

allows it to determine whether the same individual is visiting multiple websites or using multiple apps where Microsoft technology is called to or installed directly.

122.    One method is through collecting e-mail addresses.  The logic of this is straightforward.  If Microsoft collects the same e-mail address from two different site visits, it can determine with almost total accuracy that the sites are both being visited by the same person.  The same is true of devices.  If the same e-mail address is captured on two different devices, it is very likely those devices are used by the same individual.

123.    Location information functions in a similar manner.  If multiple websites or apps are visited from the same location, the pool of potential individuals who are accessing the website or app is narrowed considerably immediately and can be narrowed to a pinpoint over time.

124.    HTTP requests, when intercepted by Microsoft, collect device information that can also identify whether the same user is visiting multiple sites or apps, and can distinguish between the devices being used by a particular person.  With every visit, and every subsequent HTTP request, the device information will be identical in each.

### 3.    *User ID Mapping with getUID and mapUID*

125.    Microsoft offers tools so that its clients can identify the users they track.  Microsoft provides its clients with technology that allows them to sync user ID information to have a user ID associated with all users in all ad calls.[86]  Microsoft used the Adnxs Pixel to sync user IDs with supply partners, demand partners, and data providers.[87]

126.    According to Microsoft, when it gets an ad call, it has "to know the user's Microsoft Advertising user ID so that [it] can apply frequency and regency, segment, and other data.[88] [Microsoft] can easily do this when [Microsoft's] tag is on the page (*i.e.*, the tag domain is ib.adnxs.com or has been CNAMEd to ib.adnxs.com) because [Microsoft] can access the user's ib.adnxs.com browser cookie where [Microsoft] store[s] an Microsoft Advertising ID."[89]

---

[86]    *User ID Synching with External Partners*, Microsoft (Feb. 2, 2024), https://learn.microsoft.com/en-us/xandr/monetize/user-id-syncing-with-external-partners,

[87] *Id*.

[88] *Id*.

[89] *Id*.

127. For bidders, Microsoft states it "initiates the usersyncing process with external bidders because these bidders need to be able to make purchasing decisions based on their own user data."[90] As for data providers, Microsoft syncs "with data providers because they send [Microsoft] more data to bid on. This leads to making better bidding decisions based on having better information available."[91]

128. Microsoft is able to sync user IDs through two pixels: mapUID and getUID.[92] The mapUID services passes Microsoft's clients' internal ID to Microsoft for mapping to the Microsoft Advertising ID within the Microsoft Advertising cookie store.[93]

129. The average time to live for mapUID mappings is around 2.5 weeks. Thus, Microsoft stresses the importance of its clients firing the mapUID pixel "as frequently as possible and on as many pages as possible to keep [the] mappings live."[94]

130. The getUID service, initiated on websites by the Adnxs Pixel retrieves the Microsoft Advertising ID so Microsoft's clients can coordinate it with their own in-house ID server side or their own cookie space.[95] Then Microsoft clients can pass in an offline data feed that says, "update Microsoft Advertising user ABC with the following segment data."[96]

131. The getUID service is Microsoft's version of a data sharing practice known as "identity resolution"

132. In plain language, identity resolution is another way to monetize Microsoft's tracking, where it assigns am ID number to an individual so that the individual is attached to a record of their web and app activity for the purpose of targeted advertising.

---

[90] *Id.*

[91] *Id.*

[92] *Microsoft Invest – User ID Mapping with getUID and mapUID*, Microsoft (Feb. 23, 2024), https://learn.microsoft.com/en-us/xandr/invest/user-id-mapping-with-getuid-and-mapuid#getuid-service.

[93] *Id.*

[94] *Id.*

[95] *Id.*

[96] *Id.*

133. Once sufficient data has been collected on an individual, Defendant monetizes the individual's data in a number of ways. One way is to provide individuals' identities and web browsing information to the companies operating the Partner Pixels to assist with those companies' collection of internet users' data.

134. This process happens when both the Adnxs Pixel and a Partner Pixel are loaded onto a website. The Partner Pixel "calls" the Adnxs Pixel and the Adnxs Pixel responds with a getUID request that shares the individual's Microsoft ID and associated information, including the identifiers described above, with that Partner Pixel.

```
https://ib.adnxs.com/getuid?https://dis.criteo.com/dis/rtb/appnexus/cookiematch.aspx?appnxsid=$UID
```

135. This process happens multiple times on each website, with many tracking pixels and potential advertisers gaining access to an individual's information for bidding and targeted advertising, enriching Defendant, the other technology companies involved, and the host websites alike while trampling consumer privacy in the process. Transmissions of this type are happening across all of the websites and apps where the Adnxs pixel is loaded.

136. With respect to the delivery of targeted advertisements on websites, Defendant's ID syncing makes the entire real-time-bidding process possible by identifying the individual visiting the site and providing information about their web activity and interests. This creates the basis for hyper-targeted advertising related to that activity and those interests to be served. This ultimately benefits the website or app operator, as it makes their userbase more valuable because said users have been further identified and linked to other activity via the Microsoft's pixels.

137. For these processes to happen, Defendant must necessarily share the information it collects on individual internet users with its partners.

138. The identity resolution service aids in the wiretapping and surveillance conducted by the Pixel Partners.

139. As part of their investigation, Plaintiffs' counsel conducted testing on several websites to provide a sample of the widespread tracking and wiretapping of, and targeted advertising to, millions of Americans by Microsoft. For each of the websites tested, there are hundreds or

thousands of others where the same or similar information is collected.  *See* Factual Allegations § III, *infra*.

140.    Specifically, Plaintiffs' counsel found that each website and/or app had Partner Pixels loaded onto it, which in turn communicated with the Adnxs pixel to better enable their advertising. Each Partner Pixel would itself intercept users' communications with the website or app.  The Adnxs pixel would then assign a Microsoft ID to the user's activity on the website or app, which, among other things, (i) allowed for the user to be identified; (ii) link the user to information from across other websites and apps; and (iii) benefit the websites, apps, and Partner Pixels by making that user more valuable to advertisers because the user could be better targeted with relevant ads due to the extensive information Defendant collected and provided to the Partner Pixels.

**B.    Xandr**

141.    Xandr, formerly known as AppNexus, is a real-time bidding advertising platform powered by Microsoft.  Xandr offers products and services for "executing programmatic advertising campaigns across screens and tapping into engaged audiences."[97]  In other words, Xandr offers a portfolio of advertising and analytics products and services that provide Microsoft's clients the technology to buy and sell digital advertising space, data management, and analytics tools.[98]  Xandr's features include real-time bidding, programmatic buying … as well as tools for creative optimization and audience targeting … and solutions for video and mobile advertising."[99]  Xandr achieves this through three products: Microsoft Invest, Microsoft Monetize, and Microsoft Curate.  Xandr is both a demand-side platform and a supply-side platform.[100]

142.    Xandr partners with third-party providers who receive platform data and other consumer information (however, the extent of this data is unknown as it is confidential and tied to

---

[97] *Xandr Platform Documentation*, Microsoft, https://learn.microsoft.com/en-us/xandr/ (last accessed Feb. 10, 2025).

[98] *What is Xandr?* Zuuvi, https://www.zuuvi.com/display-advertising-platforms/xandr (last accessed Feb. 10, 2025).

[99] *Id*.

[100] *Differences Between DSPs, SSPs, and DMPs in Advertising*, SetupAd (Sept. 25, 2024), https://setupad.com/blog/dsp-vs-ssp (last accessed Feb. 10, 2025).

specific contracts between Xandr and its customers[101]).[102]

143.    As a result, Xandr shares information about consumers with over a thousand ad-server partners, hundreds of bidder partners, and 115 user sync providers.[103] Xandr's bidders receive full details of every auction the bid request.[104] These details include: auction ID, Xandr user ID, referrer URL (usually the URL of a webpage visited by the individual), IP address, data about a user collected by Microsoft (known as "segment information"), data about a user that has been shared by another data provider.[105]

### 1.    Microsoft Invest

144.    Microsoft Invest is a "strategic buying platform built for the needs of today's advertisers looking to invest in upper-funnel buying and drive business results."[106] This means that Microsoft Invest is a tool aimed at the beginning of a consumer's journey, where a consumer begins to find information on products or services needed or desired.[107] "This is possibly the most critical step in the funnel because potential consumers have the tendency to turn toward the business most effective at capturing their attention."[108]

145.    Microsoft Invest "is an end-to-end, integrated platform across the buy and sell side, which provides a number of benefits to users, including: seamless integration with major ad

---

[101]  *Policies and Regulations*, Microsoft, https://learn.microsoft.com/en-us/xandr/policies-regulations/ (last accessed Feb. 10, 2025).

[102]  *Third Party Providers*, Microsoft (Feb. 7, 2024), https://learn.microsoft.com/en-us/xandr/policies-regulations/third-party-providers.

[103]  *Id.*

[104]  *Xandr's Bidders*, Microsoft (Feb. 27, 2024), https://learn.microsoft.com/en-us/xandr/data-providers/segment-usage-by-buyers#xandrs-bidders.

[105]  *Id.*

[106]  *About Microsoft Invest*, Microsoft, https://learn.microsoft.com/en-us/xandr/invest/about-invest (last accessed Feb. 10, 2025).

[107]  Matt Colborn, *Upper Funnel vs. Lower Funnel*, Matrix Point, https://www.thematrixpoint.com/resources/articles/upper-funnel-vs-lower-funnel (last accessed Feb. 10, 2025).

[108]  *Id.*

---

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    36
CASE NO.: 3:25-CV-10557-CRB

networks, exchanges, and aggregators[;] [s]treamlined, direct access to premium omnichannel supply[; and r]educed discrepancies and optimal match rates on [their] platform supply."[109]

146. Microsoft Invest features the Microsoft Advertising platform, which is a real-time bidding system and ad server.[110] The main processing system of the platform receives ad requests, applies data to the request, receives bids, makes decisions, serves creatives, and logs auctions, among other functions.[111]

147. Microsoft Invest offers the "universal pixel"—a pixel that provides insights into the interaction that users have with a website, so that Microsoft clients can easily segment, *i.e.*, identify the users and measure the value of the actions they take.[112] According to Microsoft, the universal pixel removes the need to separately define conversion pixels and segment pixels.[113] Defendant's clients implement the pixel by placing the code on their website.[114] With the universal pixel, Defendant's clients are able to keep track of users by tracking the referrer URL of the page the pixel was loaded from, track standard events based on user actions on a page, and track additional metadata that is passed using a parameter along with a standard event.[115] The universal pixel enables Defendant and Defendant's clients who use the pixel to track and target consumers on the Internet.

### 2. *Microsoft Monetize*

148. Another product that Microsoft offers to track individuals on the Internet, is Microsoft Monetize. Microsoft Monetize is "a sophisticated ad management technology platform with both

---

[109] *About Microsoft Invest*, Microsoft, https://learn.microsoft.com/en-us/xandr/invest/about-invest (last accessed Feb. 10, 2025).

[110] *Id.*

[111] *Id.*

[112] *Microsoft Invest – Universal Pixel*, Microsoft (Oct. 14, 2024), https://learn.microsoft.com/en-us/xandr/invest/the-universal-pixel.

[113] *Id.*

[114] *Id.*

[115] *Id.*

buy- and sell-side capabilities.[116]  Microsoft Monetize is built on an API, the Digital Platform API, which allows Microsoft's clients to buy and sell ad space on a single, unified interface.[117][118]

149.    Through Microsoft Monetize, Defendant offers a "segment pixel," which is "placed on web pages to collect data about users, such as pages they visit, actions they take, or qualities such as gender, location, and wealth."[119]  Further, "when a segment pixel fires, the user is added to a segment, which can later be targeted in line items to attempt to reach the user again (retargeting)."[120] In this way**, users are perpetually tracked, identified and targeted or "retargeted"** over and over.

150.    Defendant's clients have "many different options for targeting users in [their] line items and campaigns."[121]  Some options Defendant offers include "targeting based on geography, domain, and inventory type" and through defining custom keys and values.[122]  "Key/value targeting allows [clients] to take information [they have] collected and target [their] line items or campaigns to specific sets of users based on that information."[123]

151.    As Defendant explains, a key is a category, such as the information a client has on the types of music users listen to or the types of cars they drive.[124]  As such, "music_genre" and "car_type" could be custom keys.[125]  A value is a specific instance of the key. For instance, the

---

[116] *Network Guide*, Microsoft (Mar. 2, 2024), https://learn.microsoft.com/en-us/xandr/monetize/network-guide.

[117] *Monetize API*, Microsoft (Mar. 4, 2024), https://learn.microsoft.com/en-us/xandr/monetize/digital-platform-ui-api-info.

[118] *About Microsoft Monetize*, Microsoft (May 10, 2024), https://learn.microsoft.com/en-us/xandr/monetize/about-monetize.

[119] *Microsoft Monetize – Object Hierarchy*, Microsoft (Nov. 3, 2024), https://learn.microsoft.com/en-us/xandr/monetize/object-hierarchy.

[120] *Id*.

[121] *Getting Started with Key/Value Targeting*, Microsoft (Mar. 2, 2024), https://learn.microsoft.com/en-us/xandr/monetize/getting-started-with-key-value-targeting.

[122] *Id*.

[123] *Id*.

[124] *Id*.

[125] *Id*.

---

music_genre key could have values such as rock, jazz, and classical and the car_type key could include sedan, coupe, and SUV.[126]

152.    This demonstrates not only that Defendant enables its clients to access vast amounts of detailed information Defendant collects on users, but also that Defendant's clients are able to quickly and easily customize and sift through that data.

153.    But the ways that Microsoft Monetize offers to track users do not stop there. Microsoft Monetize offers Defendant's clients the "conversion pixel" to track user actions on a webpage such as registering at a site or making a purchase; "the third-party creative pixel" to trigger a third-party action like performing ad verification or collecting data about the creative (which is an advertising unit created by a client for the purpose of communicating a marketing message to that client's audience and can include images, animation, video, interactive experiences or more) when a creative is served; an "impression tracker" to track impressions associated with creatives that are hosted by non-Microsoft Advertising ad servers by attaching the tracker as a "piggyback pixel" on the externally hosted creative; and a "click tracker" to track clicks associated with creatives that are hosted by non-Microsoft Advertising ad servers by also attaching the tracker as a "piggyback pixel" on the externally hosted creative;[127] and the "universal pixel" as discussed above,[128] where even the most basic implementation of the universal pixel allows Microsoft's client to track page views and identify the URLs driving them.[129]

154.    The pixel can be configured to identify events the client wants captured, such as adding an item to a shopping cart[130] or tracking when a user enters payment information at checkout.[131]

---

[126] *Id*.

[127] *Microsoft Monetize – Object Hierarchy*, *supra* note 46.

[128] *Microsoft Invest – Universal Pixel*, Microsoft (Oct. 14, 2024), https://learn.microsoft.com/en-us/xandr/invest/the-universal-pixel.

[129] *Microsoft Monetize – Universal Pixel Basic Implementation*, Microsoft (Feb. 7, 2024), https://learn.microsoft.com/en-us/xandr/monetize/universal-pixel-basic-implementation.

[130] *Microsoft Monetize – Using Events and Parameters*, Microsoft (Mar. 7, 2024), https://learn.microsoft.com/en-us/xandr/monetize/using-events-and-parameters.

[131] *Microsoft Monetize – Standard Events and Parameters*, Microsoft (Mar. 6, 2024), https://learn.microsoft.com/en-us/xandr/monetize/standard-events-and-parameters.

155.    After Microsoft's clients have set up a standard or custom event, they can use the data collected to identify audiences and conversions.[132]  An audience, or audience segment, consists of a collection of users who have interacted on a website in a similar way.[133]  After one or more audiences are configured, Microsoft's clients can target the audience from a line item.[134]  A conversion, however, is a "specific type of interaction that indicates the successful downstream effects of an ad campaign"[135] or in other words, the website user's behavior on the website conformed with what the website owner wanted the user to do.

156.    Microsoft Monetize, through Microsoft Advertising, attributes conversion to a specific user and is able to tell Microsoft's clients whether the user has converted in response to having previously viewed or clicked one of the advertiser's creatives.[136]  The universal pixel lets Microsoft's clients set up highly specific audiences and conversions based on complex rules.[137]  For instance, Microsoft's client "might determine that a user who has clicked through to an offer, viewed three or more TVs, and accessed product details for a TV that cost over $1000 should be added to an audience segment called High-End TV Buyers."[138]

157.    Defendant's targeting tools can be so precise that it allows its clients to add or remove a user from one or more segments at the same time a conversion pixel is fired.[139]  Segmenting users after conversion is done, for example, when Microsoft's clients do not want to advertise to users who

---

[132] *Microsoft Monetize – Universal Pixel Audiences and Conversions*, Microsoft (Feb. 7, 2024), https://learn.microsoft.com/en-us/xandr/monetize/universal-pixel-audiences-and-conversions.

[133] *Id.*

[134] *Id.*

[135] *Id.*

[136] *Microsoft Monetize – Conversion Attribution*, Microsoft (Feb. 26, 2024), https://learn.microsoft.com/en-us/xandr/monetize/conversion-attribution.

[137] *Microsoft Monetize – Universal Pixel Audiences and Conversions*, Microsoft (Feb. 7, 2024), https://learn.microsoft.com/en-us/xandr/monetize/universal-pixel-audiences-and-conversions.

[138] *Id.*

[139] https://learn.microsoft.com/en-us/xandr/monetize/conversion-pixels-advanced (last accessed Feb. 10, 2025).

have already purchased a product.[140]  In this way, users across the Internet are tracked and identified by some means.

158.    Microsoft Monetize also offers what it calls "birthday cookies."[141]   This is the codename for the "stamping" and ID syncing process described above.  The first time a user without one of Microsoft's cookie visits a website where a Microsoft pixel is loaded, Microsoft sets a cookie.[142]  Defendant also adds that user to the "Microsoft Advertising Birthday Cookie" segment, where the segment is exposed to all members of the platform and any member of the platform can use the segment.[143]

159.    Through its Microsoft Advertising cookie store, **Defendant is able to both recognize any given user and access their relevant user data across multiple sites and platforms**.[144]  The Microsoft Advertising cookie store is a server-side user data storage system that allows Defendant to sync user ID and frequency data across all Microsoft Advertising supply partners and store cookie data, both from Microsoft and Microsoft's clients, server side, so that it is accessible on every ad call.[145]  This allows Microsoft to "maintain consistent and comprehensive data about a user no matter where, when, or how [Microsoft is] 'seeing' them across the Internet landscape."[146]

160.    Further yet, Microsoft Monetize enables its clients to target based on location.[147]  "A geo radius segment is a list of latitude, longitude, and radius data"[148] and this data provides enough

---

[140] *Id*.

[141] *Microsoft Monetize – Birthday Cookies*, Microsoft (Mar. 1, 2024), https://learn.microsoft.com/en-us/xandr/monetize/birthday-cookies.

[142] *Id*.

[143] *Id*.

[144] *Microsoft Monetize – Server Side Cookie Store*, Microsoft (Mar. 6, 2024), https://learn.microsoft.com/en-us/xandr/monetize/server-side-cookie-store.

[145] *Id*.

[146] *Id*.

[147] *Microsoft Monetize – Geo Radius Segments*, Microsoft (Mar. 2, 2024), https://learn.microsoft.com/en-us/xandr/monetize/geo-radius-segments.

[148] *Id*.

information to locate and individual user.  Microsoft Monetize allows its clients to use geo radius segments for "geographical targeting of multiple user locations."[149]

### 3.    Microsoft Curate

161.    Microsoft Curate is another program offered by Microsoft.  Microsoft Curate allows curators to use their proprietary assets to enhance the value of a seller's inventory and create unique offerings for buyers.[150]  Curators such as retailers, data companies, independent trading desks, and other media companies can use Microsoft Curate's features to centralize their business rules and targeting configurations across DSPs to simplify their campaign execution.[151]

162.    Another feature of Microsoft Curate is that it allows Microsoft's clients, whether buyers or sellers, to interact with each other.[152]  Microsoft Curate offers a platform where Microsoft's clients can discover new partners, cultivate relationships by communicating directly in Curate, motivate partners to do business with a client, and track success of partnerships with metrics.[153] Microsoft Curate also offers a feature where Microsoft's clients can "target users based on the day and time when they see impressions."[154]

163.    Like Microsoft Invest and Microsoft Monetize, Microsoft Curate offers tools to target users on the Internet.  With system targeting on Microsoft Curate, Defendant's clients can "target users based on [that user's] operating systems, browsers, language, device model, or carrier."[155] Moreover, Microsoft Curate clients can target mobile users even when traditional cookies are not

---

[149] *Id.*

[150] *About Microsoft Curate*, Microsoft (Feb. 12, 2024), https://learn.microsoft.com/en-us/xandr/curate/about-curate.

[151] *Id.*

[152] *Microsoft Curate – Partner Center Guide*, Microsoft (Feb. 22, 2024), https://learn.microsoft.com/en-us/xandr/curate/partner-center-guide.

[153] *Id.*

[154] *Microsoft Curate – Daypart Targeting*, Microsoft (Nov. 24, 2024), https://learn.microsoft.com/en-us/xandr/curate/daypart-targeting.

[155] *Microsoft Curate – System Targeting*, Microsoft (Jan. 29, 2025), https://learn.microsoft.com/en-us/xandr/curate/system-targeting.

used in in-app mobile inventory.[156]  Defendant has engineered ways to track and target users irrespective of where that user finds themselves or what type of device they use.

164.    In sum, Defendant offers a suit of products that rely on the collection of mass amounts of data on each individual, collected both from the Microsoft pixels and other sources, including Partner Pixels and other data brokers and allow for that data to be instantly sold in a large variety of ways with entities involved in the real-time bidding and advertising delivery. This is the core of the privacy violations alleged herein: not only are individuals tracked everywhere they go online, but the data collected is sold to dozens or hundreds of other parties without their consent.

## III.    DEFENDANT'S PIXELS ARE PRESENT ON EACH OF THE SUBJECT WEBSITES AND ACROSS THE INTERNET

165.    As part of their investigation, Plaintiffs' counsel found and conducted testing on several websites to provide a sample of the widespread tracking and wiretapping of, and targeted advertising to, millions of Americans by Defendant.  For each of the websites tested, there are hundreds or thousands of others where the same or similar information is collected.

166.    Thus, the conduct alleged in this Complaint is *not* limited to the specific websites alleged below.  Indeed, even Plaintiffs by themselves visited hundreds of websites where Defendant's tracking technology is present and Plaintiffs' counsel has identified hundreds more websites where the Adnxs and Bing Pixels operate in the same manner.  Instead, these websites are merely examples of the types of data that Defendant collects, and the ways in which it surveils users across the Internet

### A.    Scientific American

167.    Scientific American is a popular American science magazine, featuring a variety of articles, news, and expert opinions from leading scientists and journalists.

168.    The website also contains ad space where companies, like Defendant, act as an advertising exchange and facilitate the real-time bidding process to hyper-target advertisements to individual website users based on= data collected about their browsing activity and other activity.

---

[156] *Id.*

169.    Unbeknownst to website visitors, the Adnxs Pixel is loaded onto the Scientific American website.

170.    As shown above, the Adnxs Pixel collects the detailed descriptive URL of the specific articles viewed by each website visitor and the articles are selected on the website (i.e., in real time), and thus collects the affirmative selections of articles by each visitor to the Scientific American website.

171.    As soon as the individual user reaches the Scientific American website, the Adnxs Pixel collects the user's IP address.

172.    The Adnxs Pixel also immediately loads the Adnxs Tracking Cookies onto the individual's browser in the manner described above.

173.    Further, the Adnxs Pixel works with other providers of identity resolution on the Scientific American website to bolster its own profile of each individual website user by incorporating the information gathered on an individual by those providers.

174. The Adnxs Pixel also collects each individual's device information as highlighted above.

175. Defendant also services real time bidding for advertisements on the Scientific American website. To do this, Defendant uses the real-time bidding process described above to auction off the ad space to advertisers interested in reaching the particular user, who is identified and profiled by the Adnxs Pixel. Plaintiffs' testing showed the Trade Desk soliciting bids for a banner advertisement on the selected page. children.org won the auction and paid approximately a $1.60 cost per thousand impressions ("CPM") to run the advertisement.[157]

---

[157] https://www.criteo.com/wp-content/uploads/2017/07/Report-criteo-the-smart-marketers-guide-to-retargeting-acronyms-one-pager.pdf

176.    In addition to facilitating the technical elements of taking bids on the advertising space, awarding a winner, and servicing the ads, Defendant facilitates the sharing of the induvial website user's information to potential bidders in order to inform whether the advertisements with be sufficiently targeted to an interested individual. Using the products described above, which are created from Defendant's consumer and advertising profiles, advertisers purchase and access information previously collected by Defendant on the individual visiting the Scientific American website and use that information to determine whether to bid on the advertising space made available by Defendant's ad exchange.

177.    Defendant, because of the setting of cookies and collecting of the user's device information and IP address, tracks the future web activity of the individual and adds that information to its consumer profiles and tracking products, as well as connecting that information to users being offered up for sale to advertisers as part of the real-time-bidding advertising process.

**B.    AliExpress**

178.    AliExpress is a discount shopping website that offers a wide variety of consumer goods for sale at very low prices.

179.    Unbeknownst to website visitors, the Adnxs Pixel is loaded onto the AliExpress website.

180.    As soon as the individual reaches the AliExpress website, the Adnxs Pixel collects the individual's IP address.

x-proxy-origin: 12.21.168.66

181.    The Adnxs Pixel also immediately loads the Adnxs Tracking Cookies onto the individual's browser in the manner described above.

set-cookie:
XANDR_PANID=3Ln34SI7mp59XKlRZQPKmuiPt16QQv0ckitP1kMHbt6WABqaLJQirzaMybh4-9
7DDyHtf8CaFT1ZIP7t0wn23YlmsTm7WOS7ymMG8Mq_G58.; SameSite=None; Path=/;
Max-Age=7776000; Expires=Tue, 29-Apr-2025 17:30:09 GMT; Domain=.adnxs.com; Secure;
Partitioned
set-cookie:
anj=dTM7k!M40N@KUGgk.r1Jb_aU0QqJ3cAD8lo`6=+IWY=RplWoL52nlut0]S!9htm<2k!gNZlZ9
zb?g6!<'U98Bp$'qg5pbcQ<O?O/IE4C[<?YX2)JJzFHCS$$(73:H73x`v?L3[J6shXDcYeQmpQ1qZ
WI_J#IdYZKVKn1@LThU$0WpoGMNVISWJe>B2rjk<?BvpeAyIP?'Z>yhEUVOO_'<nW*3]cF*e+d
tHQY$.PF%0!Wg'tjCmEb6F:]s!GK_K9#u/8hJeF5oZu$P%=?QHg4Njv5=(1<FgO8_]sl>^OV=0Y>`

182.    Also unbeknownst to visitors to the AliExpress website, the Criteo Pixel, a Partner Pixel, is loaded on the AliExpress website.

**https://sslwidget.criteo.com/event?**
a    **an=www.aliexpress.com&cn=US&ln=en**

183.    When a user clicks on a particular item to view or purchase, the unique item number of that item is contained in the detailed descriptive URL of the page of the AliExpress website selling that item.



184. As the information is entered into the website (i.e., in real time) the Criteo Pixel intercepts the information by receiving the page URL in a "GET request."

```
tld aliexpress.us
fu
https://www.aliexpress.us/item/3256806046876108.html?spm=a2g0o.home.pcJustForYou.9
.241e76dbdbVMMJ&gps-id=pcJustForYou&scm=1007.13562.333647.0&scm_id=1007.13562.3336
47.0&scm-url=1007.13562.333647.0&pvid=c0aeedc9-5d29-43e2-adb3-a1695384d3be&_t=gps-
id:pcJustForYou,scm-url:1007.13562.333647.0,pvid:c0aeedc9-5d29-43e2-adb3-a1695384d
3be,tpp_buckets:668%232846%238115%232000&pdp_npi=4%40dis%21USD%212.12%211.84%21%21
%212.12%211.84%21%402101fb0c171934528616131171ea95c%2112000036393276923%21rec%21US%
21%21AB&utparam-url=scene%3ApcJustForYou%7Cquery_from%3A
```

185. Xandr, through the Adnxs Pixel, provides identity resolution to a number of Partner Pixels on the AliExpress website.

186. Specifically, Adnxs shares the unique user ID and profile information with Criteo and a number of currently unknown Partner Pixels. The phrase "cookiematch" indicates identity resolution and "rtb" indicates the information is used in the real-time bidding process.

```
:authority: ib.adnxs.com
:method: GET
:path:
/getuid?https://dis.criteo.com/dis/rtb/appnexus/cookiematch.aspx?appnxsid=$UID
```

187. Receiving the UID allows Criteo and any other Partner Pixel to identify which individual is entering which information into the AliExpress website and, thus the Adnxs Pixel aids Criteo's wiretapping.

188. Further, the Adnxs Pixel works with other providers of identity resolution on the AliExpress website to bolster its own profile of an individual.

189.    Plaintiffs' testing shows the Adnxs Pixel working with a number of Partner Pixels, including the MediaWallah Pixel, to obtain identity resolution. This additional information is then added to Defendant's consumer and advertising profiles.

```
:authority: secure.adnxs.com
:method: GET
:path:
/getuid?https://partner.mediawallahscript.com/?account_id=2016&partner_id=208
7&uid=$UID&tag_format=img&tag_action=sync
```

```
priority: i
sec-ch-ua: "Not A(Brand";v="8", "Chromium";v="132", "Google Chrome";v="132"
sec-ch-ua-mobile: ?0
sec-ch-ua-platform: "Windows"
sec-fetch-dest: image
sec-fetch-mode: no-cors
sec-fetch-site: cross-site
user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36
(KHTML, like Gecko) Chrome/132.0.0.0 Safari/537.36
```

190.    The Adnxs Pixel also collects user device information as described above.

191.    Defendant, because of the setting of cookies and collecting of the user's device information and IP address, tracks the future web activity of the individual and adds that information to its consumer profiles and tracking products, as well as connecting that information to users being offered up for sale to advertisers as part of the real-time-bidding advertising process.

**C.    Bon Appetit**

192.    Bon Appetit is a website featuring a wide variety of recipes and related articles about restaurants and food.

193.    The website also contains ad space where companies, like Defendant, act as an advertising exchange and facilitate the real-time bidding process to hyper-target advertisements to individual website users based on data collected about their browsing activity and other activity.

194.    Unbeknownst to website visitors, the Adnxs Pixel is loaded onto the Bon Appetit website.

```
"https://nym1-ib.adnxs.com/it?an_audit=0&referrer=https%3A%2F%2Fwww.bonappetit.com%2Fgall
ery%2Ftaylor-swift-travis-kelce-pop-tarts&e=wqT_3QLDBaDDAgAAAwDWAAUBCI-Dmr0GEPnXpKTuivbfe
```

195.    As shown above, the Adnxs Pixel collects the detailed descriptive URL of the specific articles viewed by each website visitor and the articles are selected on the website (i.e., in real time), and thus collects the affirmative selections of articles by each visitor to the Bon Appetit website.



196.    As soon as the individual user reaches the Bon Appetit website, the Adnxs Pixel collects the user's IP address.

197. The Adnxs Pixel also immediately loads the Adnxs Tracking Cookies onto the individual's browser in the manner described above.

uuid2 4762255108948676925
XANDR_PANID
6d40_0ctH7XGwhvN-kTsroAmBIdnlhb_qCCaWf87ucQqlLbE9sHe5QCpNdAMd5HEVcvzetw9Kn1mZ1HP6
8ImupKQcOv3sm7koWDV2dtx0EA.
receive-cookie-deprecation          1
uids
eyJ0ZW1wVUlEcyI6eyIzM2Fjcm9zcyI6eyJ1aWQiOilyMTI5Nzk4NzgwNDI2MjIiLCJleHBpcmVzIjoiMjAyNS0
wNS0wNVQyMDoyMjo0MloifSwiYWRueHMiOnsidWlkljoiNDc2MjU1MTA4OTQ4Njc2OTI1IiwiZXhwaXJlcyl
6IjlwMjUtMDItMThUMjA6NTE6MTIuNDM2OTczODQ2WiJ9LCJhbXgiOnsidWlkljoiMTk4MDI4NDltMmY3Ni
00NGNiLThhYWUtZDBhN2UyNGM2ZmNmliwiZXhwaXJlcyI6IjlwMjUtMDItMjBUMTY6MjA6NDUuNzMzMT
UwNzU0WiJ9LCJpbm1vYmkiOnsidWlkljoiSUQ1LTUtZDNiNjI3NWMtOTBhMy00Y2MzLWE4Y2QtMDA3N
WRiY2Y3ZTQ5liwiZXhwaXJlcyI6IjlwMjUtMDUtMDVUMjE6NDY6MzBaIn0slnJ1Ymljb24iOnsidWlkljoiTTQ3
N0ZVOUgtWC1CRIVSliwiZXhwaXJlcyI6IjlwMjUtMDUtMDhUMjA6MDQ6MDFaIn0slnNvdnJuIljp7InVpZCI6I
kp4WHZBVFpIMjFUaEsyNTBUbzZZWN0RZUilsImV4cGlyZXMiOilyMDI1LTA1LTA1VDIwOjIyOjQwWiJ9LCJ
0ZWxhcmllhljp7InVpZCI6IjkyNWEwZDhhMzQ3NzQwNzM4YmJjNzRIZDAzMTNjZDVkliwiZXhwaXJlcyI6IjI
wMjUtMDUtMDVUMjA6MjE6NDFaIn0slnRyaXBsZWxpZnQiOnsidWlkljoiMjQ4NDgwMjA5NjcwOTE1NjE4Nj
c3NCIsImV4cGlyZXMiOilyMDI1LTA1LTA1VDIwOjQ1OjAxWiJ9LCJ0cmlwbGVsaWZ0X25hdGl2ZSl6eyJ1a
WQiOilyNDg0ODAyMDk2NzA5MTU2MTg2Nzc0liwiZXhwaXJlcyI6IjlwMjUtMDUtMDVUMjA6NDU6MDFaIn
0slnRydXN0eCI6eyJ1aWQiOiJIZGU3MzQ0My0wNWl5LTQ1OGEtOTdhMi1mMWRjNmlwNjM0ZWEiLCJle
HBpcmVzIjoiMjAyNS0wNS0wNVQyMDoyMjo0MloifX19

198. Defendant, through the Adnxs Pixel, provides identity resolution to <u>over 20 Partner Pixels</u> on the Bon Appetit website throught getUID, and mapUID requests.

https://ib.adnxs.com/getuidnb?https%3A%2F%2Fsync.taboola.com%2Fsg%2Fappnexus-netwo
rk%2F1%2Frtb-h%2F%3Ftaboola_hm=%24UID&orig=trc          GET ib.adnxs.com
/getuidnb?https%3A%2F%2Fsync.taboola.com%2Fsg%2Fappnexus-network%2F1%2Frtb-h%2F%3F
taboola_hm=%24UID&orig=trc
Fri Feb 07 15:16:53 EST 2025

https://ib.adnxs.com/mapuid?member=181&user=&gdpr=0&gdpr_consent=&google_gid=CAESE
LmXTehhiTjikbOYNtOYgyY&google_cver=1          GET ib.adnxs.com
/mapuid?member=181&user=&gdpr=0&gdpr_consent=&google_gid=CAESELmXTehhiTjikbOYNtOYg
yY&google_cver=1
Fri Feb 07 15:16:37 EST 2025

199. Further, the Adnxs Pixel works with other providers of identity resolution on the AliExpress website to bolster its own profile of each individual website user by incorporating the information gathered on an individual by those providers.

200. The Adnxs Pixel also collects each individual's device information as described above.

```
"device": {
    "useragent": "Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36
(KHTML, like Gecko) Chrome/132.0.0.0 Safari/537.36",
    "w": 3072,
    "h": 1728
```

201. Defendant also services real time bidding for advertisements on the Bon Appetit website. To do this, Defendant uses the real-time bidding process described above to auction off the ad space to advertisers interested in reaching the particular user, who is identified and profiled by Xandr and the Adnxs Pixel. Plaintiffs' testing showed Xandr soliciting bids for a banner advertisement on the selected page. YouTube TV (through Google's advertising service, DoubleClick) won the auction and paid approximately a $0.67 cost per thousand impressions ("CPM") to run the advertisement.[158]

**Summary:**
Bon Appétit's website is requesting an ad for a 728x90 banner slot on the Taylor Swift & Travis Kelce Pop-Tarts article.
The request is sent to Adnxs (XANDR) to solicit bids from advertisers.
YouTube TV is seen in the response paying for their ad to be placed on the website.

```
"primary_size": {
    "width": 728,
    "height": 90
},
"ad_types": ["banner"],
"uuid": "1190c58504a97a15",
"id": 18589466,
"allow_smaller_sizes": false,
"use_pmt_rule": false,
"prebid": true,
"disable_psa": true,
"reserve": 0.05,
"gpid": "3379/conde.bonapp/footer/cooking/gallery/1",
"hb_source": 1
```

[158] https://www.criteo.com/wp-content/uploads/2017/07/Report-criteo-the-smart-marketers-guide-to-retargeting-acronyms-one-pager.pdf

```
"ads": [{
    "cpm": 0.672614,
    "cpm_publisher_currency": 0.672614,
    "publisher_currency_code": "$",
    "publisher_currency_codename": "USD",
    "content_source": "rtb",
    "ad_type": "banner",
    "buyer_member_id": 2062,
    "creative id": 588061589,
```

```
"rtb": {
    "banner": {
        "content": "<!-- Creative 588061589 served by Member 2062 via
AppNexus --><html> <body> <div id='native-88450260608919254597'> </div>\n<script
src=\"https://dcdn.adnxs.com/renderer-content/1e7f25e2-757c-4238-9cde-bf5e0e85754b\"></sc
ript>\n<script> render_3660(JSON.parse(\"{\\\"title\\\":\\\"Watch the NHL
live\\\",\\\"desc\\\":\\\"See games live, record and watch later with DVR, or catch
highlights with Key
Plays\\\",\\"sponsored\\\":\\\"YouTubeTV\"\\\",\\\"main_img\\\":{\\\"url\\\":\\\"https://s
hftr.adnxs.net/r?url=https%3A%2F%2Fs0.2mdn.net%2Fsimgad%2F11081234068398227419&width=1200
&height=627&crop=1&bidder=101&buying_member=1212&selling_member=7529&creative_id=58806158
9\\\",\\\"width\\\": 1200,\\\"height\\\":
```

202.    In addition to facilitating the technical elements of taking bids on the advertising space, awarding a winner, and servicing the ads, Defendant facilitates the sharing of the induvial website user's information to potential bidders in order to inform whether the advertisements with be sufficiently targeted to an interested individual. Using the products described above, which are created from Defendant's consumer and advertising profiles, advertisers purchase and access information previously collected by Defendant on the individual visiting the Bon Appetit website and use that information to determine whether to bid on the advertising space made available by Defendant's ad exchange.

203.    Plaintiffs' testing showed dozens of "prebid" requests related to the ad space facilitated by Defendant, meaning the individual website user's information is shared with each of those companies.

```
https://ib.adnxs.com/prebid/setuid?bidder=lemmadigital&uid=ae2bcf28-e590-11ef-b47b
-d08e79f6cf7e&f=b      GET ib.adnxs.com
/prebid/setuid?bidder=lemmadigital&uid=ae2bcf28-e590-11ef-b47b-d08e79f6cf7e&f=b
Fri Feb 07 15:18:23 EST 2025        1x1
```

204.    Defendant, because of the setting of cookies and collecting of the user's device information and IP address, tracks the future web activity of the individual and adds that information to its consumer profiles and tracking products, as well as connecting that information to users being offered up for sale to advertisers as part of the real-time-bidding advertising process.

**D.    Buzzfeed**

205.    Buzzfeed is a popular entertainment and culture website, featuring a variety of articles and quizzes related to popular culture.

206.    Unbeknownst to visitors of the Buzzfeed website, the Adnxs Pixel is loaded onto the website.

## https://ib.adnxs.com/ut/v3/prebid

207.    When a user visits the Buzzfeed website, the Adnxs Pixel automatically collects the user's IP address.

```
x-proxy-origin: 12.21.168.66; 12.21.168.66;
```

208.    The Adnxs Pixel also immediately loads the Adnxs Tracking Cookies onto the individual's browser in the manner described above.

**uuid2** 4762255108948676925
**XANDR_PANID**
gcCam31Jgo65_lpt8XQmjXVRZQW_stSNUZ_OEcFV6PZZIdEkeoqnDVP7yWvB1IdJMETLA8vc
-Agz4wtK8J0kmsXkJBqWCxXb6S34e_mOj9E.
**receive-cookie-deprecation** 1
**icu**
ChgI39VKEAoYBSAFKAUwk4mKvQY4A0AFSAUKGQi22oQBEAoYASABKAEw-O2JvQY4AEA
BSAEQk4mKvQYYBQ..
**usersync**
eNqdWNtqW0EM_Jfz7AdppV1p_SullJL6wZAmIQ6IJeTfa2jxMXRXXc2rjwdJo8tI-779OL1ezs9P2
5EP28v55-nxsh0_vW_nb9tRD9vl19PDI8vb19e36x9M3KhI87-_Pzx_f3k8vZ2unz4OfyA1D_ERh
GqjOaSPrVgAYcp7xgxgANJ4wppxgGljjOscU3hCdQkwdYzRfzF0w9gIoxzFUzzvm0jeNwG4Ij6xI
3M7qstIfcNUynNw-5aIxwd2qJtbDTCcrzdHfJO8nc75eustP3aYar4QmDWfVWbEvSIASBwYpgpU

209.    Defendant provides identity resolution to *at least 11 Partner Pixels on the Buzzfeed website*. The Adnxs Pixel shares both the UID created to track users with the cookies loaded onto their browsers and the user's IP address with each Partner Pixel.

```
https://ssp-sync.criteo.com/user-sync/match?p=Ho_0nF9tNXZpY01VZ3prb0NPaGY1R3diNGd
wUFBEUzV1cUtVS3liT0hpRVlWVWxRJTNE&u=476255108948676925&gdpr=&gdpr_consent=
```

210.    Defendant also services real time bidding for advertisements on the Buzzfeed website. To do this, Defendant identifies the user as described above and collects the URL for the page visited by the user as the user clicks on a particular link or article (i.e., in real time).

```
      "rd_ref":
"https%3A%2F%2Fwww.buzzfeed.com%2Fkristatorres%2Fdouchebag-reddit",
```

211.    Defendant also shares the information it has gathered on a particular user through its Microsoft Invest, Microsoft Monetize, and Microsoft Curate products to allow bidding partners to know that their advertisements will be targeted to a user's interests.

212.    Defendant facilitates advertising on specific spaces on the Buzzfeed website. For example, Xandr operates the advertising space for a video ad on a particular article published by Buzzfeed.

```
}],
"primary_size": {
    "width": 600,
    "height": 338
},
"ad_types": ["video"],
"uuid": "522b26551066c6",
"id": 26682145,
"allow_smaller_sizes": false,
"use_pmt_rule": false,
"prebid": true,
"disable_psa": true,
"reserve": 1.65,
"position": 0,
"gpid": "/23bdb39b/buzzfeed/kristatorres/Desktop",
```

213.    Defendant uses the real-time bidding process described above to auction off the ad space to advertisers interested in reaching the particular user, who is identified and profiled by

Defendant and the Adnxs Pixel. In the image below, the auction id shows that the ad space is available for bidding and the UUID is the unique identifier assigned to a particular user.

```
"version": "3.0.0",
"tags": [{
    "uuid": "522b26551066c6",
    "tag_id": 26682145,
    "auction_id": "80966876463380101096",
    "nobid": true,
    "ad_profile_id": 0
```

214.    During the test of the Buzzfeed website, the Partner Pixel Criteo submitted a request to bid on the advertisement, located on the specific Buzzfeed article.

```
    "rd_can": "https://www.buzzfeed.com/kristatorres/douchebag-reddit"
},
"eids": [{
    "source": "criteo.com",
    "id":
"91zfb19FMHhGUGJBQjR6V0hCUWlMbDRMTEdOUkhFMW4xRnpJSDNjRFV0eER5eXphUFhnTk03QllxQTFX
NkJoMm9lNUY0bGdSZXVnRTEwMGgwWVFLZXMwaFBhZlB6ZHdpNzklMkJvZVpkWFM1aWRKMVJBJTNE"
```

215.    As with the Bon Appetit website, the facilitation of advertising space requires the sharing of information about each user with multiple parties who may bid to advertise to that particular user.

216.    Defendant also, because of the setting of cookies and collecting of the user's device information and IP address, tracks the future web activity of the individual and adds that information to its consumer profiles and tracking products, as well as connecting that information to users being offered up for sale to advertisers as part of the real-time-bidding advertising process.

**E.    Expedia**

217.    Expedia is a travel website that allows visitors to book vacations, hotels, flights, and other travel-related reservations.

218.    Unbeknownst to website visitors, the Bing Pixel is loaded onto the Expedia website.

219.    When a user clicks on a particular reservation—and again when they complete the purchase, the name of the hotel and dates of booking are contained in the detailed descriptive URL of each page as described above.

220.    As that information is entered by the individual into the Expedia website (i.e., in real time) the information is intercepted by the Bing Pixel.

221.    The information collected by the Bing Pixel is then transferred to Defendant, who adds it to its consumer profiles, which are included in the products described above and used in the real-time-bidding process.

### F.    Hyatt

222.    Hyatt is one of the largest hotel chains in the world.  Hyatt customers can book hotel reservations on the Hyatt website.

223.    Unbeknownst to website visitors, the Adnxs Pixel is loaded onto the Hyatt website.

224.    The Adnxs Pixel immediately loads the Adnxs Tracking Cookies onto the individual's browser in the manner described above.

```
uuid2    22754270303355917771
usersync
eNqdWM1qm0EMfJfv7MPqZ6Vdv0oppaQ-GNIkxKa0hLx7DQn9elitV3O1PYw0kkfSvm2_Tq-X8_PTdqTD9r
L-fXq8bMcvb9v5x3bUw3b58_Tw7XL9_nq9_cCZuzaX-vn5w_PPl8fT9XT76v3wAal5SBtCrHoM6QHLBEI1
HxkRgAFEo0A1KxOMDTGtSYzhcT7mfYKp-fKwA5iWj01kmaf8wwBaSw9iazFGNY-pJa-BUZ7HOK9BA2Jr49
ha73F9GhKbLPPsFkKA7VheayoVAJHm1aahJbjxTG5iWQbtTNIAA1bKV4m0AepVXwbtQtiwiXphm5lwzXc4
Wcu3OBMQHlPLS840drsb1QQEjRZmhEnyxWUpAJMoUCcxQHIVILxgwtwB2TJoV0-RNqqI5JXyxsJVgZxqR2
iQ4gZudAfU88bCgRvNJTdbFmJncslvuezAJGR3ICfvwHIcbStzEANt1BRhqgjIlqfGXtwOhCelBCCa7OLF
80NNoktuYMs7EwFrpZDkiyvhYUYTECPqcQeYhAHJRfJtJKJATuOhdic8RW5H7QHTxI2kAn93CQbAyCx3IQ
zp8uCwm3eEIRdxtMPOBoA4Ep4Dp5C4AcV1pI28L4P2OrUCCNFkOaf_mDR_E0o4ambhQVOjI3XqbZlpz6kI
K4GOh9pcci3ADquF8x6hRZCcNP_woQV4pNXwyXUGkg5IriX_EKgKXNSqijAZUFx1JLyeGNRf3_8Cu8huXA
..
icu ChkIwP2XARAKGBogGigaMOapyrUGOAdAGkgaEOapyrUGGBk.
```

225.    As website visitors select hotels and dates of booking (i.e. in real time), the Adnxs Pixel intercepts this information.

https://secure.adnxs.com/getuid?https://pixel.mediaiqdigital.com/pixel?u1=57407921&u2=1592.00&u8=Culver%20City&u9=destination&u19=2024-11-20&u20=2024-11-24&u10=KING&u11=1&u13=ADPR&u5=019146c69d970002b4a1e2bd7eee0506f0016067012d8&u6=1&u7=0&pixel_id=848530&uid=$UID

**Parameters and Their Meanings:**
u1=57407921 → Unique transaction or booking ID.
u2=1592.00 → Price or monetary value (e.g., booking cost).
u8=Culver City → Location or user destination.
u9=destination → Travel or purchase type.
u19=2024-11-20 and u20=2024-11-24 → Date range (e.g., check-in/check-out dates).
u10=KING → Hotel room type or other category data.
u11=1 → Quantity or selection count.
u13=ADPR → Advertisement or campaign code.
u5=019146c69d970002b4a1e2bd7eee0506f0016067012d8 → Possibly a hashed user identifier or session ID.
pixel_id=848530 → A tracking pixel ID to identify specific user interactions.
uid=$UID → Placeholder for a unique user identifier assigned by Adnxs.

226. The Adnxs Pixel also shares the intercepted information with Partner Pixels. The below image shows the Adnxs Pixel passing the individual's UID, alongside the intercepted information, to Media IQ (now known as MIQ), another data broker who uses intercepted information to service advertising.

227. The Adnxs Pixel provides similar identity resolution to at least 2 other Partner Pixels.

228. Defendant also, because of the setting of cookies and collecting of the user's device information and IP address, tracks the future web activity of the individual and adds that information to its consumer profiles and tracking products, as well as connecting that information to users being offered up for sale to advertisers as part of the real-time-bidding advertising process.

**G.    Plushcare**

229. Plushcare is an online healthcare provider that allows its patients to make medical appointments and purchase medication on its website.

230. Unbeknownst to website visitors, the Adnxs Pixel is loaded onto the Plushcare Website.

231.    When a user visits the Plushcare website, the Adnxs Pixel automatically collects the user's IP address.

232.    The Adnxs Pixel also immediately loads the Adnxs Tracking Cookies onto the individual's browser in the manner described above.

**uuid2** 4762551089486676925
**XANDR_PANID**
gcCam31Jgo65_lpt8XQmjXVRZQW_stSNUZ_OEcFV6PZZIdEkeoqnDVP7yWvB1IdJMETLA8vc
-Agz4wtK8J0kmsXkJBqWCxXb6S34e_mOj9E.
**receive-cookie-deprecation** 1
**icu**
ChgI39VKEAoYBSAFKAUwk4mKvQY4A0AFSAUKGQi22oQBEAoYASABKAEw-O2JvQY4AEA
BSAEQk4mKvQYYBQ..
**usersync**
eNqdWNtqW0EM_Jfz7AdppV1p_SulIJL6wZAmIQ6IJeTfa2jxMXRXXc2rjwdJo8tI-779OL1ezs9P2
5EP28v55-nxsh0_vW_nb9tRD9vI19PDI8vb19e36x9M3KhI87-_Pzx_f3k8vZ2unz4OfyA1D_ERh
GqjOaSPrVgAYcp7xgxgANJ4wppxgGljjOscU3hCdQkwdYzRfzF0w9gIoxzFUzzvm0jeNwG4lj6xI
3M7qstlfcNUynNw-5aIxwd2qJtbDTCcrzdHfJO8nc75eustP3aYar4QmDWfVWbEvSIASBwYpgpU

233.    Defendant because of the setting of cookies and collecting of the user's device information and IP address, tracks the future web activity of the individual and adds that information to its consumer profiles and tracking products, as well as connecting that information to users being offered up for sale to advertisers as part of the real-time-bidding advertising process.

234.    Defendant also provides identity resolution to <u>at least 3 Partner Pixels, including the Criteo Pixel on the Plushcare website.</u>  The Adnxs Pixel shares both the UID created to track users with the cookies loaded onto their browsers and the user's IP address with each Partner Pixel

235.    Unbeknownst to visitors on the Plushcare website, the Criteo Partner Pixel is loaded onto the website.

236.    When a user selects the condition for which they are seeking treatment, that information is contained in a detailed descriptive URL as described above.

https://ib.adnxs.com/getuid?https%3A%2F%2Fdis.criteo.com%2Fdis%2Frtb%2Fappnexus%2F
cookiematch.aspx%3Fappnxsid=%24UID          GET ib.adnxs.com
/getuid?https%3A%2F%2Fdis.criteo.com%2Fdis%2Frtb%2Fappnexus%2Fcookiematch.aspx%3Fa
ppnxsid=%24UID
Fri Feb 07 09:48:24 EST 2025





237.    As the user navigates through the website, the Criteo Pixel intercepts the URL of each page visited by each individual website visitor, thus intercepting communications between the visitor and the Plushcare website about the individual's medical symptoms and treatment.

238.    The UID shared by Defendant allows Criteo and any other Partner Pixel to identify which individual is entering which information into the Plushcare website and, thus the Adnxs Pixel aids Criteo's wiretapping.

**H.    Zillow**

239.    Zillow is a website where users can search for properties to buy or rent, connect with the owners of those properties and request tours.

**1.    The Adnxs Pixel on the Zillow Website**

240.    Unbeknownst to users, the Adnxs Pixel is loaded onto the Zillow website.

241.    As soon as the user reaches the Zillow website, the Adnxs Pixel loads cookies onto the individual's browser in the manner described herein.

242.    As soon as the user reaches the Zillow website, the Adnxs Pixel intercepts the user's IP address in the manner described herein.

243.    The Adnxs Pixel also receives the user's device information in the manner described herein.

244.    The Adnxs Pixel also intercepts the detailed, full-string URL of the pages visited by each user, revealing search terms and properties selected by that user.



245.    The Adnxs Pixel is also participating in a real-time bidding process on the Zillow website. Defendant's role involves sharing information with advertisers and Parter Pixels in order to make decisions regarding bidding on ad space offered by Zillow.

```
}],
"primary_size": {
    "width": 300,
    "height": 250
},
"ad_types": ["banner"],
"uuid": "6f27ad4cae5a59",
"id": 29112587,
"allow_smaller_sizes": false,
"use_pmt_rule": false,
"prebid": true,
"disable_psa": true,
"gpid": "/7449/zillow/search_results_1/rent_general/b_right_p1",
"hb_source": 1
```

246.    Defendant, through the Adnxs Pixel, provides identity resolution to numerous Partner Pixels on the Zillow website, causing the information it has gathered on the user to be shared widely with other data brokers, identity graph providers, and AdTech companies.

247.    Defendant also, because of the setting of cookies and collecting of the user's device information and IP address, tracks the future web activity of the individual and adds that information to its consumer profiles and tracking products, as well as connecting that information to users being offered up for sale to advertisers as part of the real-time-bidding advertising process.

### 2.    The Bing Pixel on the Zillow Website

248.    Also unbeknownst to users, the Bing Pixel is loaded onto the Zillow website.

249.    Just like the Adnxs Pixel, as soon as the user reaches the Zillow website, the Bing Pixel loads cookies onto the user's browser in the manner described herein.

**Cookies:**
MUID    1E67DFC780E069471693C931815E6844
MR    0

250.    The Bing Pixel also intercepts detailed, full-string URLs containing the search terms entered and properties viewed by the user.



https://www.zillow.com/sacramento-ca/rentals/?searchQueryState={"isMapVisible":true,"mapBounds":{"north":38.89509983522196,"south":38.32151687578028,"east":-121.2186576171875,"west":-121.7130423828125},"filterState":{"fr":{"value":true},"fsba":{"value":false},"fsbo":{"value":false},"nc":{"value":false},"cmsn":{"value":false},"auc":{"value":false},"fore":{"value":false}},"isListVisible":true,"mapZoom":11,"usersSearchTerm":"Sacramento, CA","regionSelection":[{"regionId":20288,"regionType":6}]}

251. Defendant also, because of the setting of cookies by the Bing Pixel, tracks the future web activity of the individual and adds that information to its consumer profiles and tracking products, as well as connecting that information to users being offered up for sale to advertisers.

**I.     Redfin**

252. Redfin is a website where users can search for properties to buy or rent, connect with the owners of those properties and request tours.

**1.     The Adnxs Pixel on the Redfin Website**

253. As soon as the user reaches the Redfin website, the Adnxs Pixel loads cookies onto the user's browser in the manner described herein.

```
Cookies:
uuid2   8740867893863375003
icu
ChgIuqI3EAoYECAQKBAwjK3TxAY4EEAQSBAKGQiilpwBEAoYASABKAEw5a3TxAY4AUABSAEQ5a3Tx
AYYEA..
XANDR_PANID
Nh7pFGoaXFIWtq54X9hZIEfikvQoFszIDDDJGh9NHo_7pdImc1tw_0aIVj3xILFRCXtFkx8CJEj3typCttzKiM
cIJZD3DnLTfOxoID4Gcp8.
anj
```

254. The Adnxs Pixel also collects the user's device information in the manner described herein.

255. The Adnxs Pixel collects the user's IP address in the manner described herein.

```
x-proxy-origin: 12.          12.          797.bm-nginx-loadbalancer.mgmt.nym2.adnexus.net;
*.adnxs.com
x-xss-protection: 0
```

256.    The Adnxs Pixel also intercepts the detailed, full-string URL of each page of the Redfin website the user visits, thereby collecting the search terms entered and properties selected by the user.

"referrer_detection": {
    "rd_ref":
"https%3A%2F%2Fwww.redfin.com%2FCA%2FOakland%2F1145-Mandana-Blvd-94610%2Fhome%2F913016",

257.    The Adnxs Pixel also provides identity resolution to at least two Partner Pixels on the Redfin website, furthering disseminating the information it has collected on the user. The image below shows the Adnxs Pixel cookie syncing with Liveramp and The Trade Desk, two data brokers.

},
"eids": [{
    "source": "liveramp.com",
    "id": "AphU-VIinvLzE2bQ5gl_PscM1O5WI4OOSEduOGHPL4XI26CBX7jBTZmxe00gcFVNLiKT"
}, {
    "source": "adserver.org",
    "id": "6db0887d-4b94-45ee-add6-8dd1c3ef7bea",
    "rti_partner": "TDID"

258.    Defendant, also, because of the setting of cookies and collecting of the user's device information and IP address, tracks the future web activity of the individual and adds that information to its consumer profiles and tracking products, as well as connecting that information to users being offered up for sale to advertisers as part of the real-time-bidding advertising process.

**2.    The Bing Pixel on the Redfin Website**

259.    Also unbeknownst to users, the Bing Pixel is loaded onto the Redfin Website.

260.    As soon as the user reaches the Redfin Website, the Bing Pixel loads cookies onto the individual's browser in the manner described herein.

Cookies:
MUID   13A73BEE500C62C22A722E4051296399
SRCHD   AF=NPNEW1
SRCHUID   V=2&GUID=0383CDA8DDA84F1BA6B78293FEA8DFBD&dmnchg=1
SRCHUSR   DOB=20250512&DS=1
_RwBf
r=0&ilt=2&ihpd=0&ispd=2&rc=10&rb=0&rg=200&pc=5&mtu=0&rbb=0&clo=0&v=2&l=2025-05-12T07:00:0
0.0000000Z&lft=0001-01-01T00:00:00.0000000&aof=0&ard=0001-01-01T00:00:00.0000000&rwdbt=0&rw
flt=0&rwaul2=0&g=&o=2&p=&c=&t=0&s=0001-01-01T00:00:00.0000000+00:00&ts=2025-05-12T21:15:54.
7764130+00:00&rwred=0&wls=&wlb=&wle=&ccp=&cpt=&lka=0&lkt=0&aad=0&TH=&cid=0&gb=
SRCHHPGUSR
SRCHLANG=en&IG=77A8FDF6A704449D87B79A812A01E5C4&HV=1747084563&HVE=CfDJ8lnh5QCo
SQBNls38F2rbEpRf8iBACwoSkeVsSO001ph2jZ1UR6eiCPZojnNn7fzDZGDpnOB0nfeWT7t0HabAar6OH
qMDMDxHAKCPruWi2M9eKJ8YR797pWY_n6C6vPUMtn9Ha93xVrX1tkGsSJXg68BOPYeo1HDfqj5hakX5
Q53hlpGqz5zK780oZqUuNQzXAg&DM=0&BRW=N&BRH=M&CW=1203&CH=978&SCW=1188&SCH=16
84&DPR=1.3&UTC=-240&EXLTT=2&PV=19.0.0&PRVCW=1114&PRVCH=915&WTS=63882681354

261.    The Bing Pixel also intercepts the detailed, full-string URL of each page of the Redfin website the user visits, thereby collecting the search terms entered and properties selected by the user.

mid   4578da5f-b8f5-4af5-9971-c5795cef7ef3
bo    6
sid    1689fc7073ad11f08e999fc7c7acd505
vid    168a2bb073ad11f09bb3ff723df19267
vids   0
msclkid    N
ec    View_Content
el    page_view
gc    USD
tpp    1
ea    impression
en    Y
p
https%3A%2F%2Fwww.redfin.com%2FCA%2FOakland%2F1145-Mandana-Blvd-94610%2Fhome%2F913

262.    Defendant also, because of the setting of cookies by the Bing Pixel, tracks the future web activity of the individual and adds that information to its consumer profiles and tracking products, as well as connecting that information to users being offered up for sale to advertisers.

**J.      Healthline**

263.    Healthline is a website where users can search for articles regarding specific health information and access certain online health tools, such as an ovulation calculator.

**1.      The Adnxs Pixel on the Healthline Website**

264.    Unbeknownst to users, the Adnxs Pixel is loaded onto the Healthline website.

265.    As soon as the user reaches the Healthline website, the Adnxs Pixel loads cookies onto the user's browser in the manner described herein.

Cookies:
uids
eyJ0ZW1wVUlEcyI6eyJhbXgiOnsidWlkIjoiMmQ0YTIyNTAtZjYwYy00MzdkLWIxMmEtMzdiNWVjMWZkZW
RiMmQ0YTIyNTAtZjYwYy00MzdkLWIxMmEtMzdiNWVjMWZkZWRiIiwiZXhwaXJlcyI6IjIwMjUtMTItMjJUMT
U6MjU6MTNaIn0sInJ1Ymljb24iOnsidWlkIjoiTThZWjJMRlotMjgtMUtTMiIsImV4cGlyZXMiOiIyMDI1LTEyLTI
yVDE1OjI0OjI1WiJ9LCJ0cmlwbGVsaWZ0X25hdGl2ZSI6eyJ1aWQiOiI3NTAyNTcyNTI0Mjc2MjQxMzE5Mz
ciLCJleHBpcmVzIjoiMjAyNS0xMi0yMlQxNToyNTo0OFoifSwidHJpcGxlbGlmdCI6eyJ1aWQiOiI3NTAyNTcy
NTI0Mjc2MjQxMzE5MzciLCJleHBpcmVzIjoiMjAyNS0xMi0yMlQxNToyNTo0OFoifSwiY29ubmVjdGFkIjp7In
VpZCI6IjY5MTJjYzRmLTM4M2YtNGEyYy05MGM3LTk2YjBkNGQwMGMxYyIsImV4cGlyZXMiOiIyMDI1LT
EyLTIyVDE1OjI2OjI3WiJ9fX0=
anj
dTM7k!M4.gEs8>[F']wlg2E?fm>/g?!A#En-VkA`]nwf`Yq?kC_C?D=M1NvUQWdz0O9@+I<mHSugG.Lq_U9
e$2(Pp#wFoLo_iZ<b#dT0682svhD(>w@.xpH^Gm0ujD>[mcFopYbD>@ghHMMC+3bmMLSLOXz$doXg'[
wuH2hkA?fA(<X`o^R/%]L0lCrG8kmsf(odHyDL%6glu*t@XJ+F#vbpgffh/oYr=W$BLx+(fli+Sn.FZG!:_Z83y9(
^mmV0MhJ:Rgkpf2qC`l#!ceh/C$l$/FK]h)49:x=7R%t8F)'pOKBEKGmAG3o(1Z@4h1l#5K+DX`T4N-#_iw7k
CyjuBmDGXf[WTNeT@ZP3RmkV(%ZtXP)j.gY='vq
icu
ChklieOgARAKGBcgFygXMISTy8YGOAJAF0gXChkljOOgARAKGAEgASgBMKH3ysYGOABAAUgBEIST
y8YGGBc.
XANDR_PANID
XnISLV2yd8483xemKkssAtwM380CAXvSZfaGkPQv9SkFNHm7bH9Mwm30qejfKBDHQRLNb2BwawOT6
DDCXqXVwx_zDMw1x2_NQRlbTEG7hWY.
uuid2    3493090656890632052

266.    The Adnxs Pixel also intercepts the user's device information in the manner described herein.

267.    The Adnxs Pixel also intercepts the user's IP address in the manner described herein.

x-proxy-origin: 216.█████████; 216.█████████894.bm-nginx-loadbalancer.mgmt.lax1.adnexus.net;
*.adnxs.com
x-xss-protection: 0

268.    The Adnxs Pixel intercepts detailed, full-string URLs for each page the user visits, thus intercepting search terms entered and information selected by the user.



269.    The Adnxs Pixel is also facilitating the real-time bidding process on the Healthline website. This process involves Defendant cookie syncing with and providing identity resolution to numerous Parter Pixels.

```
"ad_types": ["banner"],
"uuid": "33dd603797b1f838",
"id": 11002902,
"allow_smaller_sizes": false,
"use_pmt_rule": false,
"prebid": true,
"disable_psa": true,
"reserve": 0.1,
"position": 1,
"keywords": [{
    "key": "k1",
    "value": ["othermentalhealth"]
}, {
    "key": "k2",
    "value": ["healthsystems"]
```

270. The image below shows Defendant sharing information with 33across, and SSP and identity graph provider, Yahoo, a data broker, and Liveramp, a data broker.

```
"eids": [{
    "source": "33across.com",
    "id":
v1.0013300001b1YMsAAM.1046.2VJcwXkC9OQgnuLsMrUmuuA0TeuEU83R1C9Q6g6S2C2be0wOEVk
C4M3lkhbTusjAssHzmLl4KwEuBep7kpuvWH6hSU3lJ38ilQM7Md3WTeR+O85nBJvlPTh6nN6lLNHS90tE
lVw8LQocG2GOUm6QCO6t+u2BdyKoOLNs1niv24qkiJ6DZlqSecTJktmZjeQ5x4hZjrPp50v0Wl2PGuJltyf
v3LpCArl51pe8/vESQuAHPQh/LBmKookYUcHajY9Mop28VsCTJOuf3SUB1JF3b/Fn4kP0F+TBARf2Zpb
J5VlCbKaJIVR+pUKdPE/YtLztR6pdnHp5aS9yJyYU6yxhXXckAo7hu+Q7nFuHBmQO+lEs99LETob+z6Mr
V+Fy63192QGz76ootVjr6FzPegbFO/blamiTzvt0mShzDv3TWoSxKyLS3TkiuvuRvg3bwT6c5HAHGCPM5
bBSw/kClPBJU8WgwXxykUQ/4O1VWBTLNoIMHMDUMZjeepZupxS2Zs5XebRb7NolJ1TLT52tdOzHloT4
:TxO2NmzqEWQSFLHiQU9W9nL2FFOtsuvL6Wgm05cNlSslcp6vfLAzj06EM7Fs25/RWY12ZxFr2iRKFNK
VKmFF96Y8L6KzmT08CvAlXmmxTRTVxhBc1frlTWMRRYhU921FVCJfgVe9EfvNQ8EgA="
  }, {
    "source": "yahoo.com",
    "id":
PSombFEYumFoSWq6KBmo1j4xboEf4RWOSVJf_nHVmbDR946Hlh1J63-ShidpNfsCouw_TGfuTlB07Sz
J0BITGw"
  }, {
    "source": "liveramp.com",
    "id": "AqFel6zPxp9_elyrl5EbT8olnoXs8pYe-6mlPQrJ2VaRPutbsl1xDrPfbEmtlUEoM9eEJA"
  }, {
```

271. Defendant also, because of the setting of cookies and collecting of the user's device information and IP address, tracks the future web activity of the individual and adds that information to its consumer profiles and tracking products, as well as connecting that information to users being offered up for sale to advertisers as part of the real-time-bidding advertising process.

### 2.      The Bing Pixel on the Healthline Website

272. Also unbeknownst to users, the Bing Pixel is loaded on the Healthline Website.

273. As soon as the user reaches the Healthline website, the Bing Pixel loads cookies onto the user's browser in the manner described herein.

**Cookies:**
MUID    0FFBBDD1904B69AC1260AAC3913D684D

274.    The Bing Pixel also intercepts the detailed, full-string URL for each page of the Healthline the user visits. In the example below, when the user visits the Healthline ovulation calculator, the Bing Pixel intercepts that information, and therefore, the users' selection of the ovulation calculator.



275.    Defendant also, because of the setting of cookies by the Bing Pixel, tracks the future web activity of the individual and adds that information to its consumer profiles and tracking products, as well as connecting that information to users being offered up for sale to advertisers.

IV.    **DEFENDANT'S SERVICES DEANONYMIZE USERS AND ENRICH DEFENDANT, WEBSITE OPERATORS, AND PARTNER PIXELS ALIKE THROUGH REAL-TIME BIDDING AND PROFILING INDIVIDUALS**

A.    **Defendant Combines The Data From All The Subject Websites With Other Data To Deanonymize Users**

276.    As a result of Microsoft's technology being deployed on thousands or millions of websites, Defendant is collecting various forms of PII and web activity records of nearly every American and sells that data to target advertising.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED          71
CASE NO.: 3:25-CV-10557-CRB

277. The information collected, on its own, is enough to identify the individual internet user. But this is only the first step in Defendant's practices of dragnet surveillance.

278. Defendant also combines the data from each and every website a person visits with other data collected by its partner advertisers. Further, through Microsoft's user ID syncing processes, Microsoft has access to not only its own information that it tracks from Internet users, but also the information that its partner advertisers track.[159] In this way, Microsoft amasses and aggregates Internet users' data and sells it back to its' partner advertisers. According to Microsoft, its clients can seamlessly integrate with major ad networks, exchanges, aggregators, and SSPs to buy data.[160] Microsoft notes that some of its key inventory supply partners are: Google Ad Manager, Microsoft Ad Exchange, Yahoo Ad Exchange, OpenX, Pubmatic, and The Rubicon Project, some of the largest players in the data-sharing space.[161]

**B.     The Partner Pixels Use The Profiles Created By Defendants To Enhance Their Advertising And Analytics Services**

279. In addition to contributing vast amounts of data to Microsoft's data profiles, the data collected by Microsoft is utilized by both Microsoft and the Partner Pixels to conduct hyper-targeted advertising through the real-time bidding process. *See* Factual Allegations § I.B, *supra*.

280. The Microsoft identity resolution process is a key part of a complex ecosystem of pixels that deliver detailed user information to advertisers to increase the efficiency of those advertisements.

281. Further, the delivery of advertisements, facilitated by the Xandr technology, involves the sharing of vast amounts of consumer information with Partner Pixels.

282. When Microsoft shares website visitor information with a Pixel Partner, that partner (i) uses the information provided by Microsoft to add information to its own data and advertising datasets and (ii) shares the identity information with other advertisers during the real-time bidding delivery of advertisements.

---

[159] Microsoft, *supra* note 76.

[160] *About Microsoft Monetize*, Microsoft (May 10, 2024), https://learn.microsoft.com/en-us/xandr/monetize/about-monetize.

[161] *Exchanges and Aggregators*, Microsoft (Mar. 2, 2024), https://learn.microsoft.com/en-us/xandr/monetize/exchanges-and-aggregators.

283.    For ads to be delivered as soon as a website user visits a site, multiple technology companies need access to detailed information about the identity and interests of the individual website visitor.

284.    This information is provided by the Partner Pixels, who use Defendant's identity resolution services or advertising services (which they pay for) to create and expand their own datasets, which they in turn disclose to other players in the real-time bidding ecosystem as advertisements are delivered on websites.

285.    Each time a user is selected by this network of advertisers to receive an ad, the advertisers "bid" on the user—meaning Defendant or the Partner Pixels are paid for the information they have stored about that user.  Millions of these bids are made per day across the Internet, demonstrating the immense value of the data Defendant improperly collects on Plaintiffs and Class Members.

286.    As such, the improper collection of vast amounts of data on Plaintiffs and Class Members is done both for Defendant's profit and for the profit of the Partner Pixels.

287.    Defendant's business model has nothing to do with maintaining any of its customers' websites.  Defendant's technology is used for the sole purpose of collecting data and selling that data to target advertising. As described above, the data collected about an individual from a website is not only used by the operator of the website, but is used by Defendant across the internet and is sold to numerous data brokers and online advertisers who have no connection whatsoever to the original website.

V.    **PLAINTIFFS' EXPERIENCES**

A.    **Plaintiff Stacy Penning**

288.    Plaintiff Stacy Penning visited over 100 websites where Defendant's Adnxs Pixel was present, including ScientificAmerican.com, Buzzfeed.com, Zillow.com, Redfin.com, fidelity.com, farmers.com, and edwardjones.com,  while in California.

289.    Unbeknownst to Plaintiff Penning, the Adnxs Pixel was loaded onto each website.

290. When Plaintiff Penning visited the websites, The Adnxs Pixel and installed multiple separate cookies onto Plaintiff Penning's browser. This is confirmed by the presence of those cookies in his browser cache.

291. The Adnxs Pixel collected information about Plaintiff Penning, including the webpages he visited, his IP address, and fingerprint information about his device and browser, among others.

292. Defendant shared Plaintiff Penning's IP address, Microsoft ID, previously collected information, and information about which pages of the websites he visited with every Partner Pixel to which it provided identity resolution through the Adnxs Pixel.

293. Defendant compiled the information it collected into a profile on Plaintiff Penning and added the bolstered profile to its suite of data products described above.

294. Plaintiff Penning also visited over 100 websites where Defendant's Bing Pixel was present, including Zillow.com, Healthline.com, Redfin.com, Walgreens.com, Schwab.com, Prudential.com

295. Also unbeknownst to Plaintiff Penning, the Bing Pixel was loaded onto each website.

296. When Plaintiff Penning visited the websites, The Bing Pixel and installed multiple separate cookies onto Plaintiff Penning's browser. This is confirmed by the presence of those cookies in his browser cache.

297. The Bing Pixel collected information about Plaintiff Penning, including the webpages he visited and fingerprint information about his device and browser, among others.

298. Defendant compiled the information it collected into a profile on Plaintiff Penning and added the bolstered profile to its suite of data products described above

299. Defendant also, by using the cookies loaded onto Plaintiff Penning's browser, tracked his future web browsing activity across the internet and assisted other Partner Pixels in tracking and wiretapping his communications with websites.

300. Plaintiff Penning was unaware that Defendant was installing trackers on his browser, wiretapping his communications, aiding in the wiretapping of his communications by Partner Pixels, deanonymizing his personal data, or collecting, selling, and disclosing his personal data to

advertising technology companies, other data brokers, or any person or entity doing business with Defendant. Nor could Plaintiff Penning have discovered these facts.

301. Plaintiff Penning did not provide his prior consent to Defendant to install trackers on his browser, wiretap his communications, aid in the wiretapping of his communications, deanonymize his personal data, or collect, sell, and disclose his personal data to advertising technology companies, other data brokers, or any person or entity doing business with Defendant. Nor did Defendant obtain a court order to do the same.

302. Plaintiff Penning has, therefore, had his privacy invaded by Defendant's violations of CIPA §§ 631(a) and 638.51(a), and Defendant has been unjustly enriched by the disclosure and sale of the improperly collected data concerning Plaintiff Penning.

**B.    Plaintiff SungGil Hong**

303. Plaintiff SungGil Hong visited over 100 websites where Defendant's Adnxs Pixel was present, including Buzzfeed.com, Hyatt.com, Bonappetit.com, fidelity.com, Menshealth.com, Webmd.com, and Cvs.com while in California.

304. Unbeknownst to Plaintiff Hong, the Adnxs Pixel was loaded onto each website.

305. When Plaintiff Hong visited the websites, The Adnxs Pixel and installed multiple separate cookies onto Plaintiff Hong's browser. This is confirmed by the presence of those cookies in his browser cache.

306. The Adnxs Pixel collected information about Plaintiff Hong, including the webpages he visited, his IP address, and fingerprint information about his device and browser, among others.

307. Defendant shared Plaintiff Hong's IP address, Microsoft ID, previously collected information, and information about which pages of the websites he visited with every Partner Pixel to which it provided identity resolution through the Adnxs Pixel.

308. Defendant compiled the information it collected into a profile on Plaintiff Hong and added the bolstered profile to its suite of data products described above.

309. Plaintiff Hong also visited over 100 websites where Defendant's Bing Pixel was present, including Redfin.com, Bonappetit.com, Buzzfeed.com, Aliexpress.us, cvs.com, and fidelity.com.

310. Also unbeknownst to Plaintiff Hong, the Bing Pixel was loaded onto each website.

311. When Plaintiff Hong visited the websites, The Bing Pixel and installed multiple separate cookies onto Plaintiff Hong's browser. This is confirmed by the presence of those cookies in his browser cache.

312. The Bing Pixel collected information about Plaintiff Hong, including the webpages he visited and fingerprint information about his device and browser, among others.

313. Defendant compiled the information it collected into a profile on Plaintiff Hong and added the bolstered profile to its suite of data products described above.

314. Defendant also, by using the cookies loaded onto Plaintiff Hong's browser, tracked his future web browsing activity across the internet and assisted other Partner Pixels in tracking and wiretapping his communications with websites.

315. Plaintiff Hong was unaware that Defendant was installing trackers on his browser, collecting his IP address, wiretapping her communications, aiding in the wiretapping of his communications by Partner Pixels, deanonymizing his personal data, or collecting, selling, and disclosing his personal data to advertising technology companies, other data brokers, or any person or entity doing business with Defendant. Nor could Plaintiff Hong have discovered these facts.

316. Plaintiff Hong did not provide his prior consent to Defendant to install trackers on his browser, wiretap his communications, aid in the wiretapping of his communications, deanonymize his personal data, or collect, sell, and disclose his personal data to advertising technology companies, other data brokers, or any person or entity doing business with Defendant. Nor did Defendant obtain a court order to do the same.

317. Plaintiff Hong has, therefore, had his privacy invaded by Defendant's violations of CIPA §§ 631(a) and 638.51(a), and Defendant has been unjustly enriched by the disclosure and sale of the improperly collected data concerning Plaintiff Hong.

**C.    Plaintiff Laura Bonetti**

318. Plaintiff Laura Bonetti visited numerous websites where Defendant's Adnxs Pixel was present, including Zillow.com and Bon Appetit.com,  while in California.

319. Unbeknownst to Plaintiff Bonetti, the Adnxs Pixel was loaded onto each website.

320.    When Plaintiff Bonetti visited the websites, The Adnxs Pixel and installed multiple separate cookies onto Plaintiff Bonetti's browser. This is confirmed by the presence of those cookies in her browser cache.

321.    The Adnxs Pixel collected information about Plaintiff Bonetti, including the webpages she visited, his IP address, and fingerprint information about her device and browser, among others.

322.    Defendant shared Plaintiff Bonetti's IP address, Microsoft ID, previously collected information, and information about which pages of the websites she visited with every Partner Pixel to which it provided identity resolution through the Adnxs Pixel.

323.    Defendant compiled the information it collected into a profile on Plaintiff Bonetti and added the bolstered profile to its suite of data products described above.

324.    Plaintiff Bonetti also visited numerous websites where Defendant's Bing Pixel was present, including Zillow.com, and spirit.com.

325.    Also unbeknownst to Plaintiff Bonetti, the Bing Pixel was loaded onto each website.

326.    When Plaintiff Bonetti visited the websites, The Bing Pixel and installed multiple separate cookies onto Plaintiff Bonetti's browser. This is confirmed by the presence of those cookies in her browser cache.

327.    The Bing Pixel collected information about Plaintiff Bonetti, including the webpages she visited and fingerprint information about her device and browser, among others.

328.    Defendant compiled the information it collected into a profile on Plaintiff Bonetti and added the bolstered profile to its suite of data products described above.

329.    Defendant also shared the information it collected on Plaintiff Bonetti with advertisers to facilitate the real-time bidding process for ad space on the websites.

330.    Defendant also, by using the cookies loaded onto Plaintiff Bonetti's browser, tracked her future web browsing activity across the internet and assisted other Partner Pixels in tracking her and wiretapping her communications with websites.

331.    Plaintiff Bonetti was unaware that Defendant was installing trackers on her browser, wiretapping her communications, aiding in the wiretapping of her communications by Partner Pixels,

deanonymizing her personal data, or collecting, selling, and disclosing her personal data to advertising technology companies, other data brokers, or any person or entity doing business with Defendant.  Nor could Plaintiff Bonetti have discovered these facts.

332.    Plaintiff Bonetti did not provide her prior consent to Defendant to install trackers on her browser, wiretap her communications, aid in the wiretapping of her communications, deanonymize her personal data, or collect, sell, and disclose her personal data to advertising technology companies, other data brokers, or any person or entity doing business with Defendant. Nor did Defendant obtain a court order to do the same.

333.    Plaintiff Bonetti has, therefore, had her privacy invaded by Defendant's violations of CIPA §§ 631(a) and 638.51(a), and Defendant has been unjustly enriched by the disclosure and sale of the improperly collected data concerning Plaintiff Bonetti.

**D.    Plaintiff Jonathan Finestone**

334.    Plaintiff Jonathan Finestone, while in California, visited dozens of websites where the Adnxs Pixel was present, including Hyatt.com, Americanexpress.com, Hawaiianairlines.com, and Paychex.com.

335.    Unbeknownst to Plaintiff Finestone, the Adnxs Pixel was loaded onto each website.

336.    When Plaintiff Finestone visited the websites, The Adnxs Pixel and installed multiple separate cookies onto Plaintiff Finestone's browser.

337.    The Adnxs Pixel collected information about Plaintiff Finestone, including the webpages he visited, his IP address, and fingerprint information about his device and browser, among others.

338.    Defendant shared Plaintiff Finestone's IP address, unique ID numbers, previously collected information, and information about which pages of the websites he visited with every Partner Pixel to which it provided identity resolution through the Adnxs Pixel.

339.    Defendant compiled the information it collected into a profile on Plaintiff Finestone and added the bolstered profile to its suite of data products described above.

340.    Plaintiff Finestone also visited, while in California,  dozens of websites where Defendant's Bing Pixel was present, including Lyft.com, Yahoo.com, Schwab.com, and Citi.com.

341. Also unbeknownst to Plaintiff Finestone, the Bing Pixel was loaded onto each website.

342. When Plaintiff Finestone visited the websites, The Bing Pixel and installed multiple separate cookies onto Plaintiff Finestone's browser.

343. The Bing Pixel collected information about Plaintiff Finestone, including the webpages he visited and fingerprint information about his device and browser, among others.

344. Defendant compiled the information it collected into a profile on Plaintiff Finestone and added the bolstered profile to its suite of data products described above.

345. Defendant also shared the information it collected on Plaintiff Finestone with advertisers as described above.

346. Defendant also, by using the cookies loaded onto Plaintiff Finestone's browser, tracked his future web browsing activity across the internet and assisted other Partner Pixels in tracking him and wiretapping his communications with websites.

347. Plaintiff Finestone was unaware that Defendant was installing trackers on his browser, wiretapping his communications, aiding in the wiretapping of his communications by Partner Pixels, deanonymizing his personal data, or collecting, selling, and disclosing his personal data to advertising technology companies, other data brokers, or any person or entity doing business with Defendant. Nor could Plaintiff Finestone have discovered these facts.

348. Plaintiff Finestone did not provide his prior consent to Defendant to install trackers on his browser, wiretap his communications, aid in the wiretapping of his communications, deanonymize his personal data, or collect, sell, and disclose his personal data to advertising technology companies, other data brokers, or any person or entity doing business with Defendant. Nor did Defendant obtain a court order to do the same.

349. Plaintiff Finestone has, therefore, had his privacy invaded by Defendant's violations of CIPA §§ 631(a) and 638.51(a), and Defendant has been unjustly enriched by the disclosure and sale of the improperly collected data concerning Plaintiff Finestone.

**B.      Plaintiff Dilara Uskup**

350.     Plaintiff Dilara Uskup visited over 200 websites where Defendant's Adnxs Pixel was present, including Zillow.com, Healthline.com, Redfin.com, Hyatt.com, Westernunion.com, Vanguard.com, and Webmd,com,  while in California.

351.     Unbeknownst to Plaintiff Uskup, the Adnxs Pixel was loaded onto each website.

352.     When Plaintiff Uskup visited the websites, The Adnxs Pixel and installed multiple separate cookies onto Plaintiff Uskups's browser. This is confirmed by the presence of those cookies in her browser cache.

353.     The Adnxs Pixel collected information about Plaintiff Uskup, including the webpages she visited, her IP address, and fingerprint information about her device and browser, among others.

354.     Defendant shared Plaintiff Uskup's IP address, Microsoft ID, previously collected information, and information about which pages of the websites she visited with every Partner Pixel to which it provided identity resolution through the Adnxs Pixel.

355.     Defendant compiled the information it collected into a profile on Plaintiff Uskup and added the bolstered profile to its suite of data products described above.

356.     Plaintiff Uskup also visited over 200 websites where Defendant's Bing Pixel was present, including Zillow.com, Healthline.com, Redfin.com, and Mayoclinic.org.

357.     Also unbeknownst to Plaintiff Uskup, the Bing Pixel was loaded onto each website.

358.     When Plaintiff Uskup visited the websites, The Bing Pixel and installed multiple separate cookies onto Plaintiff Uskup's browser. This is confirmed by the presence of those cookies in her browser cache.

359.     The Bing Pixel collected information about Plaintiff Uskup, including the webpages she visited and fingerprint information about her device and browser, among others.

360.     Defendant compiled the information it collected into a profile on Plaintiff Uskup and added the bolstered profile to its suite of data products described above.

361.     Defendant also shared the information it collected on Plaintiff Uskup with advertisers to facilitate the real-time bidding process for ad space on the websites.

362. Defendant also, by using the cookies loaded onto Plaintiff Uskup's browser, tracked her future web browsing activity across the internet and assisted other Partner Pixels in tracking her and wiretapping her communications with websites.

363. Plaintiff Uskup was unaware that Defendant was installing trackers on her browser, wiretapping her communications, aiding in the wiretapping of her communications by Partner Pixels, deanonymizing her personal data, or collecting, selling, and disclosing her personal data to advertising technology companies, other data brokers, or any person or entity doing business with Defendant. Nor could Plaintiff Uskup have discovered these facts.

364. Plaintiff Uskup did not provide her prior consent to Defendant to install trackers on her browser, wiretap her communications, aid in the wiretapping of her communications, deanonymize her personal data, or collect, sell, and disclose her personal data to advertising technology companies, other data brokers, or any person or entity doing business with Defendant. Nor did Defendant obtain a court order to do the same.

365. Plaintiff Uskup has, therefore, had her privacy invaded by Defendant's violations of CIPA §§ 631(a) and 638.51(a), and Defendant has been unjustly enriched by the disclosure and sale of the improperly collected data concerning Plaintiff Uskup.

## CLASS ALLEGATIONS

366. **Class Definition:** Plaintiffs seek to represent a class of similarly situated individuals defined as follows:

> All persons in the United States who visited a website or mobile application where the Adnxs or Bing Tracker was present and whose information or communications were received, collected, recorded, purchased, or sold by Defendant.

367. **ECPA Subclass:** Plaintiffs also seek to represent a subclass of similarly situated individuals defined as follows:

> All persons in the United States whose communications with any website or mobile application were received, collected, or recorded by Defendant.

368. **CIPA §§ 631-632 Subclass:** Plaintiffs also seek to represent a subclass of similarly situated individuals defined as follows:

> All persons in California whose communications with any website or mobile application were received, collected, or recorded by Defendant.

369. **CIPA § 638 Subclass:** Plaintiffs also seek to represent a subclass of similarly situated individuals defined as follows:

> All persons in the California whose IP addresses, email addresses, geolocation, MAID, or device fingerprint information were collected by Defendant on any website or mobile application or who had Defendant's cookies loaded onto their browser.

370. The Class and Subclasses shall be collectively referred to as the "Classes," and Members of the Class and Subclasses will collectively be referred to as "Class Members," unless it is necessary to differentiate them.

371. Excluded from the Classes are Defendant, any affiliate, parent, or subsidiary of any Defendant; any entity in which any Defendant has a controlling interest; any officer director, or employee of any Defendant; any successor or assign of any Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

372. **Numerosity**. Members of the Classes are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiffs at this time; however, it is estimated that there are tens or hundreds of millions of individuals in the Classes. The identity of such membership is readily ascertainable from Defendant's records and non-party records, such as those of Defendant's customers and advertising partners.

373. **Typicality**. Plaintiffs' claims are typical of the claims of the Classes. Plaintiffs, like all Class Members, had their information collected and made available for sale by Defendant through the use of comprehensive user profiles compiled about Plaintiffs.

374. **Adequacy**. Plaintiffs are fully prepared to take all necessary steps to represent fairly and adequately the interests of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the members of the Classes. Plaintiffs are represented by attorneys with experience in the prosecution of class action litigation generally and in the field of digital privacy

litigation specifically. Plaintiffs' attorneys are committed to vigorously prosecuting this action on behalf of the members of the Classes.

375. **Commonality/Predominance**. Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual members because Defendant has acted on grounds generally applicable to the Classes. Such generally applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Classes include:

(a) Whether Defendant's acts and practices alleged herein constitute egregious breaches of social norms;

(b) Whether Defendant acted intentionally in violating Plaintiffs' and Class Members' privacy rights under the California Constitution or common law;

(c) Whether Defendant was unjustly enriched as a result of its violations of Plaintiffs' and Class Members' privacy rights; and

(d) Whether Plaintiffs and Class Members are entitled to damages under CIPA or any other relevant statute;

376. **Superiority**: Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiffs know of no special difficulty to that would be encountered by litigating this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### COUNT I
**Intrusion Upon Seclusion**

377. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

378. Plaintiffs bring this claim individually and on behalf of the Classes against Defendant.

379. Plaintiffs bring this claim pursuant to California law.

380. To state a claim for intrusion upon seclusion "[Plaintiffs] must possess a legally protected privacy interest … [Plaintiffs'] expectations of privacy must be reasonable … [and Plaintiffs] must show that the intrusion is so serious in 'nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms." (*Hernandez v. Hillsides, Inc*. (2009) 47 Cal. 4th 272, 286-87.)

381. Plaintiffs and Class Members have an interest in: (i) precluding the dissemination and/or misuse of their sensitive, confidential communications and information; and (ii) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to highly intrusive surveillance at every turn.

382. By conducting such widespread surveillance, Defendant intentionally invaded Plaintiffs' and Class Members' privacy rights, as well as intruded upon Plaintiffs' and Class Members' seclusion.

383. Plaintiffs and Class Members had a reasonable expectation that their communications, identities, personal activities, health and other data would remain confidential.

384. Plaintiffs and Class Members did not and could not authorize Defendant to intercept data on every aspect of their lives and activities.

385. The conduct as described herein is highly offensive to a reasonable person and constitutes an egregious breach of social norms, specifically including the following:

(a) Defendant engages in widespread data collection and interception of Plaintiffs' and Class Members' internet and app activity, including their communications with websites and apps, thereby learning intimate details of their daily lives based on the massive amount of information collected about them.

(b) Defendant combines the information collected on websites and apps with offline information also gathered on individuals to create the profiles used in the Microsoft products described herein.

(c)    Defendant creates comprehensive profiles based on this online and offline data, which violates Plaintiffs' Class Members' common law right to privacy and the control of their personal information.

(d)    Defendant sells or discloses these profiles, which contain the data improperly collected about Plaintiffs and Class Members, to an unknown number of advertisers for use in the real-time-bidding process, which likewise violates Plaintiffs' Class Members' common law right to privacy and the control of their personal information.

386.    Defendant's amassment of electronic information reflecting all aspects of Plaintiffs' and Class Members' lives into profiles for future or present use is in and of itself a violation of their right to privacy in light of the serious risk these profiles pose to their autonomy.

387.    In addition, those profiles are and can be used to further invade Plaintiffs' and Class Members' privacy by, for example, allowing third parties to learn intimate details of their lives and target them for advertising, political, and other purposes, as described herein, thereby harming them by selling this data to advertisers and other data brokers without their consent.

388.    Accordingly, Plaintiff and Class and Subclass Members seek all relief available for invasion of privacy claims under common law.

## COUNT II
### Violation Of The California Invasion of Privacy Act
### Cal. Penal Code § 631(a)

389.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

390.    Plaintiffs bring this claim individually and on behalf of the CIPA §§ 631-632 Subclass against Defendant.

391.    The California Legislature enacted the CIPA to protect certain privacy rights of California citizens. The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

392.    The California Supreme Court has repeatedly stated the "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end

of the line *permits an outsider to tap his telephone or listen in on the call.*" *Ribas*, 38 Cal. 3d at 363 (emphasis added, internal quotations omitted). This restriction is based on the "substantial distinction … between the secondhand repetition of the contents of a conversation and *its simultaneous dissemination to an unannounced second auditor*, whether that auditor be a person or mechanical device." *Id*. at 361 (emphasis added). Such "simultaneous dissemination" "denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements." *Id*.; *see also Reporters Committee for Freedom of Press*, 489 U.S. at 763 ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

393. Further, "[t]hough written in terms of wiretapping, Section 631(a) applies to Internet communications." *Javier v. Assurance IQ, LLC* 2022 WL 1744107, at *1 (9th Cir. May 31, 2022). Indeed, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.* 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013). This accords with the fact that "the California Supreme Court has [] emphasized that all CIPA provisions are to be interpreted in light of the broad privacy-protecting statutory purposes of CIPA." *Javier*, 2022 WL 1744107, at *2. "Thus, when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.,* 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

394. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.* 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

*Or*

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

*Or*

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

395. To avoid liability under CIPA Section 631(a), a defendant must show it had the consent of *all* parties to a communication, and that such consent was procured *prior to* the interception occurring. *See Javier*, *supra*, 2022 WL 1744107 at *2.

396. Defendant's various pixels and SDKs, including the Adnxs and Bing Pixels are each a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

397. Defendant is a "separate legal entity that offers [a] 'software-as-a-service' and not merely [] passive device[s]." *Saleh v. Nike, Inc.* 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, Defendant has the capability to use the wiretapped information for a purpose other than simply recording the communications and providing the communications to website operators. Accordingly, Defendant was a third party to any communication between Plaintiffs and Subclass Members, on the one hand, and any of the websites at issue, on the other. *Id*. at 521; *see also Javier v. Assurance IQ, LLC* 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

398. At all relevant times, Defendant willfully and without the consent of all parties to the communication, and in an unauthorized manner, read, attempted to read, and learned the contents of the electronic communications of Plaintiffs and Subclass Members, on the one hand, and the websites at issue, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

399. At all relevant times, Defendant uses those intercepted communications, including but not limited to building comprehensive user profiles that are offered for disclosure or sale in real-time bidding to prospective advertisers.

400. Further, Defendant "[a]ids, agrees with, employs, or conspires with" each Partner Pixel that it provides identity resolution to and who intercepts Plaintiffs' and Subclass Members' confidential communications.

401. Plaintiffs and Subclass Members did not provide their prior consent to Defendant's intentional interception, reading, learning, recording, collection, and usage of Plaintiffs' and Subclass Members' electronic communications.

402. The wiretapping of Plaintiffs and Subclass Members occurred in California, where Plaintiffs and Subclass Members accessed the websites, where Defendant's pixels were loaded on Plaintiffs' and Subclass Members' browsers, and where Defendant routed Plaintiffs' and Subclass Members' electronic communications to Defendant's servers.

403. Pursuant to Penal Code Section 637.2, Plaintiffs and Subclass Members have been injured by Defendant's violations of CIPA Section 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA Section 631(a).

<div align="center">

**COUNT III**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 638.51(a)**

</div>

404. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

405. Plaintiffs bring this claim individually and on behalf of the proposed CIPA § 638 Subclass against Defendant.

406. CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

407. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

408. A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

409. In plain English, a "pen register" is a "device or process" that records *outgoing* information, while a "trap and trace device" is a "device or process" that records *incoming* information.

410. For example, if a user sends an email, a "pen register" might record the email address it was sent from, the email address the email was sent to, and the subject line—because this is the user's *outgoing* information. On the other hand, if that same user receives an email, a "trap and trace device" might record the email address it was sent from, the email address it was sent to, and the subject line—because this is *incoming* information that is being sent to that same user.

411. Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line. As technology has advanced, however, courts have expanded the application of these surveillance devices. This, combined with the California Supreme Court's mandate to read provisions of the CIPA broadly to protect privacy rights, has led courts to apply CIPA § 638.50 to internet tracking technologies similar to Defendant's technologies at issue here. *See*, *e.g.*, *Deivaprakash v. Condé Nast Digital*, --- F. Supp. 3d ---, 2025 WL 2541952, at *2-3 (N.D. Cal. Sept. 4, 2025) (finding tracker that collected IP address and device information was a "pen register" within the meaning of CIPA); *Fregosa v. Mashable, Inc.*, 2025 WL 2886399, at *1, *5-6 (N.D. Cal. Oct. 9, 2025) (same); *Shah v. Fandom, Inc*, 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024) (same); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *3-4 (N.D. Cal. Dec. 12, 2024) (same); *Riganian v. LiveRamp Holdings, Inc.*, 2025 WL 2021802, at *11-12 (N.D. Cal. July 18, 2025) (same); *Scarlett v. Future US, LLC*, 2025 WL 2614587, *4-5 (San Francisco Cnty. Super. Ct. Sept. 5, 2025) (same); *Rose v. Variety Media, LLC*, 2025 WL 2794920, at *2-3 (Los Anges Cnty. Super. Ct. Sept. 24, 2025) (same); *Lesh v. Cable News Network, Inc.*, 767 F. Supp. 3d 33, 40-42 (S.D.N.Y. 2025) (Marrero, J.) (finding trackers similar to those here

are "pen registers" under the CIPA); *Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51."); *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023) (referencing CIPA's "expansive language" when finding software was a "pen register").

412.    The  Pixels Microsoft installed on Plaintiffs' and Subclass Members' browsers, to the extent they do not intercept "contents" of communications as defined in CIPA Section 631(a), are "pen registers" because they are "device[s] or process[es]" that "capture" the "routing, addressing, or signaling information"—the IP address, geolocation, device information, and other persistent identifiers—from the electronic communications transmitted by Plaintiffs' and Subclass Members' computers or smartphones.  Cal. Penal Code § 638.50(b); *see also Shah,* 2024 WL 4539577, at *3; *Mirmalek*, 2024 WL 4102709, at *3.

413.    At all relevant times, Defendant installed the Pixels—which are pen registers—on Plaintiffs' and Subclass Members' browsers, which enabled Defendant to collect Plaintiffs' and Subclass Members' IP addresses, geolocation, device information, and other persistent identifiers from the websites they visited.  Defendant then used the pixels to build comprehensive user profiles, which were used to unjustly enrich Defendant and its clients by linking and enhancing Plaintiffs' and Subclass Members' data when it is provided to advertisers through the real-time bidding process.

414.    Plaintiffs and Subclass Members did not provide their prior consent to Defendant's installation or use of the pixels or any other tracking technology at issue.

415.    Defendant did not obtain a court order to install or use the pixels or other tracking technology at issue.

416.    Pursuant to Penal Code Section 637.2, Plaintiffs and Subclass Members have been injured by Defendant's violations of CIPA Section 638.51(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA Section 638.51(a).

**COUNT IV**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 632**

417.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

418.    Plaintiffs bring this claim individually and on behalf of the CIPA §§631-632 Subclass against Defendant.

419.    Cal. Penal Code § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," the "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication."

420.    Section 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

421.    Plaintiffs' and Subclass members' communications to websites and mobile applications, including their sensitive personal, health, and financial information, were confidential communications for purposes of § 632, because Plaintiffs and Subclass Members had an objectively reasonable expectation of privacy in this data.

422.    Plaintiffs and Class Members expected their communications to be confined to the websites and mobile applications in part, due to the protected nature of the information at issue. Plaintiffs and Subclass Members did not expect Defendant to secretly eavesdrop upon or record this confidential information and their communications.

423.    Further, Defendant collected a massive swath of information on Plaintiffs and Subclass members, including their activity on hundreds of websites over years, which allowed Defendant to create a detailed, non-anonymous profile of Plaintiffs based on their activity across the internet, including their shopping habits, financial status and information, health information, political leanings and interests, and the media they consume.  As such, Plaintiffs had "a reasonable expectation that the immense amount of personally identifiable and browsing data allegedly collected

by the Tracking Technologies would not be shared with third parties." *Jones v. Skullcandy, Inc.*, 2026 WL 699819, at *18 (S.D. Cal. Mar. 12, 2026).

424. Defendant's tracking technology, i.e., the Adnxs Pixel, Bing Pixel, Adnxs Cookies and Bing Cookies, are all electronic amplifying or recording devices for purposes of § 632.

425. By contemporaneously intercepting and recording Plaintiffs' and Subclass Members' confidential communications to websites and mobile applications through this technology, Defendant eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

426. At no time did Plaintiffs or Subclass Members consent to Defendant's conduct, nor could they reasonably expect that such a vast swath of their online communications would be overheard or recorded by Defendant.

427. Defendant utilized Plaintiffs' and Subclass Members' sensitive personal information for its own purposes, including for the construction of profiles and for targeted advertising.

428. Plaintiffs and Subclass Members seek statutory damages in accordance with § 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Subclass in an amount to be proven at trial, as well as injunctive or other equitable relief.

429. Plaintiffs and Subclass Members have also suffered irreparable injury from these unauthorized acts. Plaintiffs' and Subclass Members' sensitive data has been collected, viewed, accessed, stored, compiled, and widely sold and disseminated by Defendant, have not been destroyed, and due to the continuing threat of such injury, have no adequate remedy at law. Plaintiffs and Subclass Members are accordingly entitled to injunctive relief.

## COUNT V
### Violation of the Electronic Communications Privacy Act
### 18 U.S.C. § 2511(1), *et seq*

430. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

431. Plaintiffs bring this claim individually and on behalf of the proposed ECPA Subclass against Defendant and on behalf of the Subclass against Defendant.

432. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. (18 U.S.C. § 2511.)

433. The ECPA protects both sending and the receipt of communications.

434. 18 U.S.C. Section 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

435. The transmission of Plaintiffs' website page visits, selections, bookings, appointment information, purchases and persistent identifiers to each website each qualify as a "communication" under the ECPA's definition of 18 U.S.C. Section 2510(12).

436. The transmission of this information between Plaintiff and Subclass Members and each website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. Section 2510(12).

437. The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." (18 U.S.C. § 2510(8).)

438. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." (18 U.S.C. § 2510(4).)

439. The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication." (18 U.S.C. § 2510(5).)

440. The following instruments constitute "devices" within the meaning of the ECPA:

(a) The Adnxs Pixel;

(a) The Bing Pixel;

(b) Any other tracking code or SDK used by Defendant;

(c) Each Partner Pixel.

441.    Plaintiff and Subclass Members' interactions with each website are electronic communications under the ECPA.

442.    By utilizing the Adnxs Pixel and Bing Pixel, as described herein, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Subclass Members in violation of 18 U.S.C. § 2511(1)(a).

443.    Defendant intercepted communications that include, but are not limited to, communications to/from Plaintiff and Subclass Members regarding their health, travel, shopping habits, consumption of media, geolocation, and many more.  This confidential information is then added to consumer profiles and monetized for targeted advertising purposes, among other things.

444.    By intentionally using, or endeavoring to use, the contents of Plaintiffs' and Subclass Members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

445.    Defendant intentionally intercepted the contents of Plaintiffs' and Subclass Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy, intrusion upon seclusion, CIPA, and other state wiretapping and data privacy laws, among others.

446.    The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.  Here, as alleged above, "[t]he association of Plaintiffs' data with preexisting user profiles is a further use of Plaintiffs' data that satisfies [the crime-tort] exception," because it "violate[s] state law, including the [CIPA], intrusion upon seclusion, and invasion of privacy." *Brown v. Google, LLC*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021); *see also Marden v.LMND Medical Group, Inc.*, 2024 WL 4448684, at *2 (N.D. Cal. July 3, 2024); *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 902 (C.D. Cal. 2024).

447.    Defendant was not acting under the color of law to intercept Plaintiff's and Subclass Members' wire or electronic communications.

448.   Plaintiffs and Subclass Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiffs' and Class Members' privacy. Plaintiff and Subclass Members had a reasonable expectation that Defendant would not intercept their communications and sell their data to dozens of parties without their knowledge or consent.

449.   The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq.*

450.   As a result of each and every violation thereof, on behalf of herself and the Subclass, Plaintiffs seek statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2510, et seq. under 18 U.S.C. § 2520.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all Class Members, seek judgment against Defendant, as follows:

(a)   For an order certifying the Classes pursuant to Fed. R. Civ. P. 23, naming Plaintiffs as the representatives of the Classes, and naming Plaintiffs' attorneys as Class Counsel to represent the Classes.

(b)   For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

(c)   For compensatory, punitive, and statutory damages in amounts to be determined by the Court and/or jury;

(d)   For pre- and post-judgment interest on all amounts awarded; and

(e)   For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all issues so triable.

Dated:  April 6, 2026                    Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:    */s/ Philip L. Fraietta*

Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
Email: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Kaili C. Lynn (State Bar No. 334933)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: klynn@bursor.com
          jwilner@bursor.com

**BURSOR & FISHER, P.A.**
Max S. Roberts (State Bar No. 363482)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10069
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-mail: mroberts@bursor.com

*Attorneys for Plaintiffs*